# CHICAGO, MILWAUKEE AND ST. PAUL RAILWAY COMPANY *v.* MINNESOTA.

ERROR TO THE SUPREME COURT OF THE STATE OF MINNESOTA.

No. 762.   Argued January 13, 14, 1890. — Decided March 24, 1890.

The act of the legislature of Minnesota, approved March 7, 1887, General Laws of 1887, c. 10, establishing a railroad and warehouse commission, being interpreted by the Supreme Court of that State as providing that the rates of charges for the transportation of property, recommended and published by the commission shall be final and conclusive as to what are equal and reasonable charges, and that there can be no judicial inquiry as to the reasonableness of such rates, and a railroad company, in answer to an application for a mandamus, contending that such rates, in regard to it, are unreasonable, and not being allowed by the state court to put in testimony on the question of the reasonableness of such rates; *Held*, that the act is in conflict with the Constitution of the United States, as depriving the company of its property without due process of law, and depriving it of the equal protection of the laws.

The State had made no irrepealable contract with the company that it should have the right for all future time to prescribe its rates of toll, free from all control by the legislature of the State.

THIS was a writ of error to review a judgment of the Supreme Court of the State of Minnesota, awarding a writ of mandamus against the Chicago, Milwaukee & St. Paul Railway Company.

The case arose on proceedings taken by the Railroad and Warehouse Commission of the State of Minnesota, under an act of the legislature of that State, approved March 7, 1887, General Laws of 1887, c. 10, entitled "An act to regulate common carriers, and creating the Railroad and Warehouse Commission of the State of Minnesota, and defining the duties of such commission in relation to common carriers." The act is set forth in full in the margin.[1]

---

[1] CHAPTER 10. — AN ACT TO REGULATE COMMON CARRIERS, AND CREATING THE RAILROAD AND WAREHOUSE COMMISSION OF THE STATE OF MINNESOTA, AND DEFINING THE DUTIES OF SUCH COMMISSION IN RELATION TO COMMON CARRIERS.

*Be it enacted by the Legislature of the State of Minnesota :*

SECTION 1. (*a*) That the provisions of this act shall apply to any common

The ninth section of that act creates a commission to be known as the "Railroad and Warehouse Commission of the

---

carrier or carriers engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water, when both are used under a common control, management or arrangement, for a carriage or shipment from one place or station to another, both being within the State of Minnesota:

*Provided,* That nothing in this act shall apply to street railways or to the carriage, storage or handling by any common carrier of property, free, or at reduced rates for the United States, or for the State of Minnesota, or for any municipal government or corporation within the State, or for any charitable purpose, or to or from fairs, and expositions for exhibition thereat, (or stock for breeding purposes,) or to the issuance of mileage, excursion or commutation passenger tickets, at rates made equal to all, or to transportation to stock shippers with cars, and nothing in the provisions of this act shall be construed to prevent common carriers, subject to the provisions of this act, from issuing passes for the free transportation of passengers.

(*b*) The term "railroad" as used in this act shall include all bridges or ferries used or operated in connection with any railroad; and also all the road in use by any corporation operating a railroad, whether owned or operated under a contract, agreement or lease; and the term "transportation" shall include all instrumentalities of shipment or carriage.

Sec. 2. (*a*) That all charges made by any common carrier, subject to the provisions of this act, for any service rendered or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, or for the receiving, delivering, storage or handling of such property shall be equal and reasonable; and every unequal and unreasonable charge for such service is prohibited and declared to be unlawful.

*Provided,* That one car-load of freight of any kind or class shall be transported at as low a rate per ton, and per ton per mile, as any greater number of car-loads of the same kind and class from and to the same points of origination or destination.

(*b*) It shall be unlawful for any common carrier, subject to the provisions of this act, to make or give any unequal or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic to any unequal or unreasonable prejudice or disadvantage in any respect whatsoever.

Sec. 3. (*a*) That all common carriers, subject to the provisions of this act, shall, according to their respective powers, provide, at the point of connection, crossing or intersection, ample facilities for transferring cars, and for accommodating and transferring passengers, and traffic of all kinds and classes, from their lines or tracks, to those of any other common car-

State of Minnesota," to consist. of three. persons to be appointed by the governor by and with the advice and consent of the senate.

---

rier whose lines or tracks may connect with, cross or intersect their own, and shall afford all equal and reasonable facilities for the interchange of cars and traffic between their respective lines, and for the receiving, forwarding and delivering of passengers and property and cars to and from their several lines and those of other common carriers connecting therewith, and shall not discriminate in their rates and charges between such connecting lines, or on freight coming over such lines; but this shall not be construed as requiring any common carrier to use for another common carrier its tracks, equipments or terminal facilities without reasonable compensation...

· (*b*) That it shall be unlawful for any common carrier subject to the provisions of this act, to enter into any combination, contract or agreement, expressed or implied, to prevent, by change of time or schedule, or by carriage in different cars, or by any other means or devices, the carriage or freight from being continuous from the place of shipment to the place of destination; and no break of bulk, stoppage or interruption made by such common carrier shall prevent the carriage of freight from being treated as one continuous carriage from the place of shipment to the place of destination, unless such break, stoppage or interruption was made in good faith for some necessary purpose and without any intent to avoid or unnecessarily interrupt such continuous carriage or to evade any of the provisions of this act.

(*c*) Every common carrier operating a railway in this State shall, without unreasonable delay, furnish, start and run cars for the transportation of persons and property, which, within a reasonable time theretofore, is offered for transportation at any of its stations on its line of road and at the junctions of other railroads, and at such stopping places as may be established for receiving and discharging passengers and freights; and shall take, receive, transport and discharge such passengers and property at, from and to such stations, junctions and places, on and from all trains advertised to stop at the same, for passengers and freights respectively, upon the due payment or tender of payment, of tolls, freight or fare therefor, if such payment is demanded. Every such common carrier shall permit connections to be made and maintained in a reasonable manner with its side tracks. to and from any warehouse, elevator or manufactory without reference to its size or capacity; provided, that this shall not be construed so as to require any common carrier to construct or furnish any side track off from its own land; provided further, that where stations are ten (10) miles or more apart the common carrier, when required to do so by the railroad and warehouse commissioners, shall construct and maintain a side track for the use of shippers between such stations.

. (*d*) Whenever any property is received by any common carrier subject to

The first section of the act declares that its provisions shall apply to any common carrier " engaged in the transportation

---

the provisions of this act, to be transported from one place to another within this State, it shall be unlawful for such common carrier to limit in any way, except as stated in its classification schedule, hereinafter provided for, its common-law liability with reference to such property while in its custody as a common carrier (as hereinbefore mentioned), such liability must include the absolute responsibility of the common carrier for the acts of its agents in relation to such property.

SEC. 4. That it shall be unlawful for any common carrier subject to the provisions of this act, to enter into any contract, agreement, or combination with any other common carrier or carriers for the division or pooling of business of different and competing railroads, or to divide between them the aggregate or net proceeds of the earnings of such railroads, or any portion thereof; and in case of an agreement for the pooling of their business aforesaid each day of its continuance shall be deemed a separate offence.

SEC. 5. That if any common carrier, subject to the provisions of this act, shall, directly or indirectly, by any special rate, rebate, drawback or other device charge, demand, collect or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property subject to the provisions of this act, than it charges, demands, collects or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of passengers or property, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful.

SEC. 6. That it shall be unlawful for any common carrier, subject to the provisions of this act, to charge or receive any greater compensation for the transportation of passengers or of like kind or class and quantity of property, for a shorter than for a longer distance over the same line, the shorter being included within the longer distance; but this shall not be construed as authorizing any common carrier, subject to the provisions of this act, to charge or receive as great compensation for a shorter as for a longer distance.

*Provided, however,* That upon application to the commission appointed under the provisions of this act, such common carrier may, in special cases, after investigation by the commissioners, be authorized to charge less, for longer than for shorter distances, for the transportation of passengers or property; and the commission may from time to time prescribe the extent to which such designated common carrier may be relieved from the operation of this section of this act.

SEC. 7. (*a*) That it shall be unlawful for any common carrier, subject to the provisions of this act, to charge or receive any greater compensation, per ton, per mile, for the contemporaneous transportation of the same class

of passengers or property wholly by railroad, or partly by railroad and partly by water, when both are used under a

---

of freight for a longer than for a shorter distance over the same line, in the same general direction, or from the same original point of departure, or to the same point of arrival; but this shall not be construed as authorizing any common carrier, subject to the provisions of this act, to charge as high a rate per ton, per mile, for a longer as for a shorter distance.

(b) Whenever any railway company doing business in this State shall be unable, from any reasonable cause, to furnish cars at any railway station or side track, in accordance with the demands made by all persons demanding cars at such stations or side tracks for the shipment of grain or other freight, such cars as are furnished shall be divided as equally as may be among the applicants until each shipper shall have received, at least, one car, when the balance shall be divided ratably in proportion to the amount of daily receipts of grain, or other freight, to each shipper, or to the amount of grain offered at such station on side tracks.

(c) There shall in no case be more than one terminal charge for switching or transferring any car, whether the same is loaded or empty, within the limits of any one city or town. If it is necessary that any car pass over the tracks of more than one company, within such city or town limits, in order to reach its final destination, or to be returned therefrom to its owner or owners, then the company first switching or transferring such car shall be entitled to receive the entire charge to be made therefor, and shall be liable to the company or companies doing the subsequent switching or transferring thereof for its or their reasonable and equitable share of the compensation received, and if the companies so jointly interested therein cannot agree upon the share thereof which each is entitled to receive, the same shall be determined by the board of railroad and warehouse commissioners, whose decision thereon shall be final and conclusive upon all parties interested, and the said board are authorized to establish such rules [and] regulations in that behalf as to them may seem just and reasonable and not in conflict with this act.

SEC. 8. (a) That every common carrier, subject to the provisions of this act, shall, within sixty (60) days after this act shall take effect, print and thereafter keep for public inspection, schedules showing the classification, rates, fares and charges for the transportation of passengers and property of all kinds and classes which such common carrier has established, and which are in force at the time, upon its railroad, as defined by the first (1st) section of this act. This schedule printed as aforesaid by such common carrier shall plainly state the places upon its railroad between which property and passengers will be carried, and shall contain "classification of freight," in force upon each [of] the lines of such railroad, a distance tariff, and a table of interstation distances, and shall also state separately the terminal charges, and any rules or regulations which in anywise change, affect or determine any part of the aggregate of such aforesaid rates, fares and

common control, management or arrangement, for a carriage or shipment from one place or station to another, both being within the State of Minnesota."

---

charges. Such schedules shall be plainly printed in large type, and copies, for the use of the public, shall be kept in every depot or station upon any such railroad, in such places and in such form that they can be conveniently inspected.

(*b*) No change of classification shall be made, and no change shall be made in the rates, fares and charges, which have been established and published as aforesaid, by any common carrier, in compliance with the requirements of this section, except after ten (10) days' public notice, which notice shall plainly state the changes proposed to be made in the schedules then in force, and the time when the changed schedules will go into effect, and the proposed changes will be shown by printing new schedules, or shall be plainly indicated upon the schedules in force at the time and kept for public inspection.

(*c*) And when any common carrier shall have established and published its classifications, rates, fares and charges in compliance with the provisions of this section, it shall be unlawful for such common carrier to charge, demand, collect or receive from any person or persons a greater or less compensation for the transportation of passengers or property or for any service in connection therewith, than is specified in such published schedule of classifications, rates, fares and charges as may at the time be in force.

(*d*) Every common carrier, subject to the provisions of this act, shall file with the commission hereafter provided for in section ten (10) of this act, copies of its schedules of classifications, rates, fares and charges which have been established and published in compliance with the requirements of this section, and shall promptly notify said commission of all changes proposed to be made in the same. Every [such] common carrier shall also file with said commission copies of all contracts, agreements or arrangements with other common carriers in relation to any traffic affected by the provisions of this act, to which contracts, agreements or arrangements it may be a party. And in cases where passengers or freight pass over lines or routes operated by more than one common carrier, and the several common carriers operating such lines or routes, establish joint schedules of rates or fares, or charges or classifications for such lines or routes, copies of such joint schedules shall also, in like manner, be filed with said commission. Such joint schedules of rates, fares, charges and classifications, for such lines, so filed as aforesaid, shall also be made public by such common carriers in the same manner as hereinbefore provided for the publication of tariffs upon its own lines.

(*e*) That in case the commission shall at any time find that any part of the tariffs of rates, fares, charges or classifications so filed and published as hereinbefore provided, are in any respect unequal or unreasonable, it shall have the power and is hereby authorized and directed to compel any

The second section declares " that all charges made by any common carrier, subject to the provisions of this act, for any

---

common carrier to change the same and adopt such rate, fare, charge or classification as said commission shall declare to be equal and reasonable. To which end the commission shall, in writing, inform such common carrier, in what respect such tariffs of rates, fares, charges or classifications are unequal and unreasonable, and shall recommend what tariffs shall be substituted therefor.

(*f*) In case such common carrier shall neglect or refuse for ten (10) days after such notice to substitute such tariff of rates, fares, charges or classifications, or to adopt the same as recommended by the commission, it shall be the duty of said commission to immediately publish such tariff of rates, fares, charges or classifications as they had declared to be equal and reasonable, and cause the same to be posted at all the regular stations on the line of such common carrier in this State, and thereafter it shall be unlawful for such common carrier to charge or maintain a higher or lower rate, fare, charge, or classification than that so fixed and published by said commission.

(*g*) If any common carrier, subject to the provisions of this act, shall neglect or refuse to publish or file its schedule of classifications, rates, fares or charges or any part thereof as provided in this section, or if any common carrier shall refuse or neglect to carry out such recommendation made and published by such commission, such common carrier shall be subject to a writ of mandamus, to be issued by any judge of the Supreme Court, or of any of the district courts of this State upon application of the commission, to compel compliance with the requirements of this section and with the recommendation of the commission and failure to comply with the requirements of said writ of mandamus shall be punishable as and for contempt, and the said commission, as complainants, may also apply to any such judge for a writ of injunction against such common carrier from receiving or transporting property or passengers within this State until such common carrier shall have complied with the requirements of this section and the recommendation of said commission; and for any wilful violation or failure to comply with such requirements or such recommendation of said commission, the court may award such costs, including counsel fees, by way of penalty, on the return of said writs and after due deliberation thereon, as may be just.

SEC. 9. (*a*) That a commission is hereby created and established, to be known as the "Railroad and Warehouse Commission of the State of Minnesota," which shall be composed of three (3) commissioners, who shall be appointed by the governor, by and with the advice and consent of the senate.

(*b*) The commissioners first appointed under this act shall continue in office for the term of one (1) two (2) and three (3) years respectively, and until their successors are appointed and qualified, beginning with the

service rendered or to be rendered in the transportation of
passengers or property as aforesaid, or in connection there-

---

first (1st) Monday of January, A.D. 1889; the term of each to be des-
ignated by the Governor, but their successors shall be appointed for a
term of three (3) years, and until their successors are appointed and qual-
ified, except that, any person chosen to fill a vacancy shall be appointed
only for the unexpired term of the commissioner whom he shall succeed.
Any commissioner may be removed by the Governor for inefficiency,
neglect of duty, or malfeasance in office. Said commissioners shall not
engage in any other business, vocation, or employment while acting as
such commissioners. No vacancy in the commission shall impair the
right of the remaining commissioners to exercise all the powers of the
commission.

(*c*) Vacancies occasioned by removal, resignation or other cause shall be
filled by the governor as provided in case of original appointments. Not
more than two of the commissioners appointed shall be members of the
same political party. No person in the employ of or holding any official
relation to any common carrier subject to the provisions of this act, or
any law of this State, or owning stocks or bonds, or other property thereof,
or who is in any manner interested therein, shall enter upon the duties of,
or hold such office.

(*d*) The decision of a majority of the commission shall be considered
the decision of the commission on all questions arising for its considera-
tion. Before entering upon the duties of his office each commissioner
shall make and subscribe and file with the Secretary of State an affidavit in
the following form: "I do solemnly swear (or affirm, as the case may be)
that I will support the Constitution of the United States and the constitu-
tion of the State of Minnesota, and that I will faithfully discharge my
duties as a member of the railroad and warehouse commission of the state
of Minnesota, according to the best of my ability; and I further declare
that I am not in the employ of, or holding any official relation to any com-
mon carrier within this state; nor am I in any manner interested in any
stock, bonds or other property of such common carrier."

(*e*) Each commissioner so appointed and qualified shall enter into bonds
[to] of the State of Minnesota, to be approved by the Governor, in the sum
of twenty thousand (20,000) dollars, conditioned for the faithful perform-
ance of his duty as a member of such commission, which bond shall be
filed with the secretary of state.

(*f*) The commission shall conduct its proceedings in such a manner as
will best conduce to the proper dispatch of business and to the ends of
justice. A majority of the commissioners shall constitute a quorum for
the transaction of business, but no commissioner shall participate in any
hearing or proceeding in which he has any pecuniary interest. Said com-
mission may from time to time make or amend such general rules or
orders as may be requisite for the order and regulation of proceedings

with, or for the receiving, delivering, storage or handling of such property, shall be equal and reasonable; and every un-

---

before it, including forms of notices and service thereof, which shall conform as nearly as may be to those in use in the courts of this State. Any party may appear before said commission and be heard in person or by attorney. Every vote and official act of the commission shall be entered of record and its proceedings shall be public upon the request of either party interested, or at the discretion of the commission. Said commission shall have an official seal which shall be judicially noticed. Any member of the commission may administer oaths and affirmations. The principal office of the commission shall be in the city of St. Paul, where its general session shall be held.

(*g*) Whenever the convenience of the public or of the parties may be promoted, or delay or expenses prevented thereby, the commission may hold special sessions in any part of the State. It may, by one, or more, of the commissioners prosecute any inquiry necessary to its duties in any part of the State, into any matter or question of fact pertaining to the business of any common carrier subject to the provisions of this act.

(*h*) The attorney general of the State of Minnesota shall be *ex officio* attorney for the commission, and shall give them such counsel and advice as they may from time to time require; and he shall institute and prosecute any and all suits which said railroad and warehouse commission may deem it expedient and proper to institute; and he shall render to such railroad and warehouse commission all counsel, advice and assistance necessary to carry out the provisions of this act, or of any law of this state, according to the true intent and meaning thereof. It shall likewise be the duty of the county attorney of any county in which suit is instituted or prosecuted, to aid in the prosecution of the same to a final issue upon the request of such commission. Said commission are hereby authorized, when the facts in any given case shall in their judgment warrant, to employ any and all additional legal counsel that they may think proper, expedient and necessary to assist the attorney general or any county attorney in the conduct and prosecution of any suit they may determine to bring under the provisions of this act, or of any law of this state.

Sec. 10. (*a*) That the commission hereby created shall have authority to enquire into the management of the business of all common carriers, subject to the provisions of this act, and shall keep itself informed as to the manner and method in which the same is conducted, and shall have the right to obtain from such common carriers full and complete information, necessary to enable the commission to perform the duties and carry out the objects for which it was created; in order to enable said commissioners efficiently to perform their duties under this act, it is hereby made their duty to cause one of their number to visit the various stations on the lines of each railroad as often as practicable, after giving twenty (20) days' notice of such visit and the time and place thereof in the local newspapers,

equal and unreasonable charge for such service is prohibited and declared to be unlawful."

---

and at least once in twelve (12) months to visit each county in the State in which is or shall be located a railroad station, and personally enquire into the management of such railroad business, and for this purpose, all railroad companies and common carriers, and their officers and employés, are required to aid and furnish each member of the railroad and warehouse commission with reasonable and proper facilities, and each, or all of the members of said commission, shall have the right, in his or their official capacity, to pass free on any railroad trains on all railroads in this State, and to enter and remain in at all suitable times, any and all cars, offices or depots, or upon the railroads of any railroad company, in this State in the performance of official duties; and whenever, in the judgment of the commission, it shall appear that any common carrier fails in any respect or particular to comply with the laws of this State, or whenever in their judgment, any repairs are necessary upon its railroad, or any addition to or change of its stations or station-houses is necessary, or any change in the mode of operating its road or conducting its business is reasonable or expedient in order to promote the security, convenience and accommodation of the public, said commission shall inform such railroad company, by a notice thereof in writing, to be served as a summons in civil actions is required to be served by the statutes of this State in actions against corporations, certified by the commission's clerk or secretary, and if such common carrier shall neglect or refuse to comply with such order, then the commission may, in its discretion, cause suits or proceedings to be instituted to enforce its orders as provided in this act.

SEC. 11. (*a*) That in case any common carrier, subject to the provisions of this act, shall do, cause to be done, or permit to be done, any act or thing in this act prohibited or declared to be unlawful, or shall omit to do any act, matter or thing in this act required to be done, such common carrier shall be liable to the person or persons, party or parties injured thereby, for the full amount of damages sustained in consequence of any such violation of the provisions of this act, together with a reasonable counsel or attorney's fee to be fixed by the court in every case of recovery, which attorney's fees shall be taxed and collected as part of the costs in the case.

(*b*) That any person or persons, party or parties claiming to be damaged by the action or non-action of any common carrier, subject to the provisions of this act, may either make complaint to the commission, as hereinafter provided for, or may bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable under the provisions of this act, in any district court of this State of competent jurisdiction; but such person or persons shall not have the right to pursue both of said remedies at the same time.

(*c*) In any action brought for the recovery of damages the court before which the same shall be pending may compel any director, officer, receiver,

The eighth section provides that every common carrier subject to the provisions of the act shall print and keep for

trustee or agent of any corporation or company, defendant in such suit, to attend, appear and testify in such case, and may compel the production of the books and papers of such corporation or company, party to any such suit; the claim that any such testimony or evidence may tend to criminate the person giving such evidence shall not excuse such witness from testifying, but such evidence shall not be used against such person on the trial of any criminal proceeding.

SEC. 12. That any common carrier, subject to the provisions of this act, or whenever such common carrier is a corporation, any director or officer thereof, or any receiver, trustee, lessee, agent or person acting for, or employed by such corporation, who, alone or with any other corporation, company, person or party, shall wilfully do or cause to be done, or shall wilfully suffer or permit to be done, any act, matter or thing in this act prohibited or declared to be unlawful, or who shall aid or abet therein, or shall wilfully omit or fail to do any act, matter or thing in this act, required to be done, or shall cause or willingly suffer or permit any act, matter or thing so directed or required by this act to be done, not to be so done, or shall aid and abet therein any such omission, or shall be guilty of any wilful infraction of this act, or shall aid or abet therein, shall be deemed guilty of a violation of the provisions of this act and shall, upon conviction thereof in any district court of the State within the jurisdiction of which such offence was committed, be subject to a penalty of not less than two thousand five hundred (2500) dollars or more than five thousand (5000) dollars for the first offence, and not less than five thousand (5000) dollars or more than ten thousand (10,000) dollars for each subsequent offence.

SEC. 13. (a) That any person, firm, corporation or association, or any mercantile, agricultural or manufacturing society, or any body politic or municipal organization, complaining of anything done or omitted to be done by any common carrier subject to the provisions of this act, in contravention of the provisions thereof, may apply to said commission by petition, which shall briefly state the facts.

(b) Whereupon a statement of the charges thus made shall be forwarded by the commission to such common carrier, who shall be called upon to satisfy the complaint, or to answer the same in writing within a reasonable time, to be specified by the commission. If such common carrier, within the time specified, shall make reparation for the injury alleged to have been done, said carrier shall be relieved of liability to the complainant only, for the particular violation of law thus complained of. If such carrier shall not satisfy the complainant within the time specified, or there shall appear to be any reasonable ground for investigating said complaint, it shall be the duty of the commission summarily to investigate the matter complained of, in such manner and by such means as it shall deem proper. No complaint shall at any time be dismissed because of absence of direct damages to the

public inspection schedules of the charges which it has established for the transportation of property; that it shall make

complainant. And for the purposes of this act the commission shall have power to require the attendance of witnesses and the production of all books, papers, contracts, agreements and documents relating to any matter under investigation, and, to that end, may invoke the aid of any of the courts of this State, in requiring the attendance of witnesses and the production of books, papers and documents, under the provisions of this act.

(c) Any of the district courts of this State, within the jurisdiction of which such inquiry is carried on, shall, in case of contumacy or refusal to obey a subpœna issued by the commissioners to any common carrier subject to the provisions of this act, or, when such common carrier is a corporation, to an officer or agent thereof, or to any person connected therewith, if proceedings are instituted in the name of such commission as plaintiffs, issue an order requiring such common carrier, officer or agent, or person to show cause why such contumacy or refusal should not be punished as and for contempt; and if upon the hearing the court finds that the inquiry is within the jurisdiction of the commission, and that such contumacy or refusal is wilful and the same is persisted in; such contumacy or refusal shall be punished as though the same had taken place in an action pending in the district court for any judicial district in this State. The claim that any such testimony or evidence may tend to criminate the person giving such evidence shall not excuse such witness from testifying; but such evidence or testimony shall not be used against such persons on the trial of any criminal proceeding.

SEC. 14. (a) Whenever an investigation shall be made by said commission, it shall be its duty to make a report in writing in respect thereto, which shall include the findings of fact upon which the conclusions of the commission are based, together with its recommendation as to what reparation, if any, should be made by the common carrier to party or parties who may be found to have been injured; and such findings so made shall thereafter, in all judicial proceedings, be deemed prima facie evidence as to each and every fact found. All reports of investigations made by the commission shall be entered of record, and a copy thereof shall be furnished to the party who may have complained, and to any common carrier that may have been complained of, and the record thereof shall be public.

(b) If in any case in which an investigation shall be made by said commission it shall be made to appear to the satisfaction of the commission, either by testimony of witnesses or other evidence, that anything has been done or omitted to be done by any common carrier, in violation of the provisions of this act or of any law cognizable by said commission, or that any injury or damages has been sustained by the party or parties complaining, or by other parties aggrieved in consequence of any such violation, it shall be the duty of the commission to forthwith cause a copy of its report in respect thereto to be delivered to such common carrier, together with a notice

no change therein except after ten days' public notice, plainly stating the changes proposed to be made, and the time when

---

to said common carrier to cease and desist from such violation and to make reparation for the injury so found to have been done, within a brief but reasonable time, to be specified by the commission; and if within the time specified, it shall be made to appear to the commission that such common carrier has ceased from such violation of law, and has made reparation for the injury found to have been done, in compliance with the report and notice of the commission, or to the satisfaction of the party complaining, a statement to that effect shall be entered of record by the commission, and the said common carrier shall thereupon be relieved from further liability or penalty for such particular violation of law.

(c) But if said common carrier shall neglect or refuse, within the time specified, to desist from such violation of law, and make reparation for the injury done in compliance with the report and notice of the commission as aforesaid, it shall be the duty of the commission to forthwith certify the fact of such neglect or refusal, and forward a copy of its report and such certificate to the attorney general of the State, for redress and punishment as hereinafter provided.

SEC. 15. (a) That it shall be the duty of the attorney general to whom said commission may forward its report and certificate, as provided in the next preceding section of this act, when it shall appear from such report that any injury or damages has been sustained by any party or parties by reason of such violation of law by such common carrier, to forthwith cause suit to be brought in the district court in the judicial district wherein such violation occurred, on behalf and in the name of the person or persons injured, against such common carrier, for the recovery of damages for such injury as may have been sustained by the injured party, and the cost and expenses of such prosecution shall be paid out of the appropriation hereinafter provided for for the uses and purposes of this act.

(b) And the said court shall have power to hear and determine the matter on such short notice to the common carrier complained of as the court shall deem reasonable; and such notice shall be served on such common carrier, his or its officers, agents or servants, in such manner as the court shall direct; and said court shall proceed to hear and determine the matter speedily, and without the formal pleading and proceedings applicable to ordinary suits in equity; but in such manner as to do justice in the premises, and to this end such court shall have power if it thinks fit to direct and prosecute, in such mode and by such persons as it may appoint, all such inquiries as the court may think needful to enable it to form a just judgment in the matter of such petition. And on such hearing the report of said commission shall be prima facie evidence of the matters therein stated.

(c) And if it be made to appear to such court, on such hearing, or on report of any such person or persons, that the lawful order or requirement of such commission, drawn in question, has been violated or disobeyed, it

they will go into effect; that it shall be unlawful for it to charge or receive any greater or less compensation than that

shall be lawful for such court to issue a writ of injunction, or other proper process, mandatory or otherwise, to restrain such common carrier from further continuing such violation or such disobedience of such order or requirement of said commission, and enjoining obedience to the same; and in case of any disobedience of any such writ of injunction or other proper process, mandatory or otherwise, it shall be lawful for such court to issue writs of attachment, or any other process of said court incident or applicable to writs of injunction or other proper process, mandatory or otherwise, against such common carrier; and if a corporation, against one or more of the directors, officers or agents of the same, or against any owner, lessee, trustee, receiver or other person failing to obey such writ of injunction or other proper process, mandatory or otherwise; and said court may, if it shall think fit, make an order directing such common carrier or other person so disobeying such writ of injunction or other proper process, mandatory or otherwise, to pay such sum of money, not exceeding for each carrier or person in default the sum of five hundred (500) dollars for every day after a day to be named in the order, that such carrier or other person shall fail to obey such injunction or other proper process, mandatory or otherwise; and such moneys shall be payable as the court shall direct, either to the party complaining, or into court to abide the ultimate decision of the court; and payment thereof may, without prejudice to any other mode of recovering the same, be enforced by attachment or order in the nature of a writ of execution, in like manner as if the same had been recovered by a final decree *in personam* in such court.

Either party to such proceeding before said court may appeal to the Supreme Court of the State, under the same regulations now provided by law in respect to security for such appeal; but such appeal shall not operate to stay or supersede the order of the court or the execution of any writ or process thereon, unless the court hearing or deciding such case should otherwise direct; and such court may, in every such matter, order the payment of such costs and counsel fees as shall be deemed reasonable.

(*d*) In case the attorney general shall not within a period of ten (10) days after the making of any order by the commission, commence judicial proceedings for the enforcement thereof, any railroad company, or other common carrier affected by such order, may at any time within the period of thirty (30) days after the service [of it] upon him or it of such order, and before commencement of proceedings, appeal therefrom to the district court of any judicial district through or into which his or its route may run, by the service of a written notice of such appeal upon some member or the secretary of such commission. And upon the taking of such appeal, and the filing of the notice thereof, with the proof of service, in the office of the clerk of such court, there shall be deemed to be pending in such court a civil action of the character and for the purposes mentioned in sec-

so established and published, for transporting property; that it shall file copies of its schedules with the commission, and

---

tions eleven (11) and fifteen (15) of this act. Upon such appeal, and upon the hearing of any application for the enforcement of any such order made by the commission or by the attorney general, the court shall have jurisdiction to examine the whole matter in controversy, including matters of fact as well as questions of law, and to affirm, modify or rescind such order in whole or in part, as justice may require; and in case of any order being modified, as aforesaid, such modified order shall for all the purposes contemplated by this act stand in place of the original order so modified.

No appeal as aforesaid shall stay or supersede the order appealed from in so far as such order shall relate to rates of transportation or to modes of transacting the business of the appellant with the public, unless the court hearing or deciding such case shall so direct.

SEC. 16. (a) That whenever facts, in any manner ascertained by said commission, shall, in its judgment warrant a prosecution, it shall be the duty of said commission to immediately cause suit to be instituted and prosecuted against any common carrier who may violate any of the provisions of this act, or of any law of this State. All such prosecutions shall be in the name of the State of Minnesota, except as is otherwise provided in this act, or in any law of this State, and may be instituted in any county in the State through or into which the line of any common carrier so sued may extend, and all penalties recovered under the provisions of this act, or of any law of this State, in any suit instituted in the name of the State, shall be immediately paid into the state treasury by the sheriff or other officer or person collecting the same; and the same shall be by the state treasurer placed to the credit of the general revenue fund.

(b) For the purposes of this act, except its penal provisions, the district courts of this State shall be deemed to be always in session.

SEC. 17. (a) That the commission is hereby directed to require annual reports from all common carriers subject to the provisions of this act, to fix the time and prescribe the manner in which said reports shall be made, and to require from such carriers specific answers to all questions upon which the commission may need information. Such annual reports shall show in detail the amount of capital stock issued, the amounts paid therefor, and the manner of payment for the same, the dividends paid, the surplus fund, if any, and the number of stockholders, the funded and floating debts and the interest paid thereon; the cost and value of the carrier's property, franchises and equipment, the number of employés and the salary paid each class, the amounts expended for improvements each year, how expended, and the character of such improvements; the earnings and receipts of each branch of business, and from all sources, the operating and other expenses; the balance of profit and loss; and complete exhibit of the financial operations of the carrier each year, including an annual balance-sheet; also the total number of acres of land received as grants

shall notify such commission of all changes proposed to be made; that in case the commission shall find at any time that

either from the United States or from the State of Minnesota, the number [of] acres of said grants sold, and average price received per acre, the number of acres of grants unsold and the appraised value per acre. Such detailed reports shall also contain such information in relation to rates or regulations concerning fares or freights and agreements, arrangements or contracts with express companies, telegraph companies, sleeping and dining car companies, fast-freight lines, and other common carriers, as the commission may require, with copies of such contracts, agreements or arrangements.

(*b*) And the commission may, within its discretion, for the purpose of enabling it the better to carry out the purposes of this act, prescribe (if in the opinion of the commission it is practicable to prescribe such uniformity and methods of keeping accounts) a period of time within which all common carriers, subject to the provisions of this act, shall have, as near as may be, a uniform system of accounts, and the manner in which such accounts shall be kept.

SEC. 18. (*a*) That such commissioners shall, on or before the first (1st) day of December in each year, and oftener if required by the governor to do so, make a report to the governor of their doings for the preceding year, containing such facts, statements and explanations as will disclose the actual workings of the system of railroad transportation in its bearings upon the business and prosperity of the people of this State, and such suggestions in relation thereto as to them may seem appropriate.

(*b*) They shall also, at such times as the Governor shall direct, examine any particular subject connected with the conditions and management of such railroads, and report to him in writing, their opinion thereon, with their reasons therefor. Said commissioners shall also investigate and consider what, if any, amendment or revision of the railroad laws of this State the best interests of the State demand, and they shall make a special biennial report on said subject to the governor. All such reports made to the governor shall be by him transmitted to the legislature at the earliest practicable time.

(*c*) Nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies. *Provided,* That no pending litigation shall in any way be affected by this act.

SEC. 19. Each commissioner shall receive an annual salary of three thousand (3000) dollars, payable in the same manner as the salaries of other state officers. The commissioners shall appoint a secretary, who shall receive an annual salary of eighteen hundred (1800) dollars, payable in like manner. Said secretary shall, before entering upon the duties of his office, make and file with the secretary of state an affidavit in the following form: "I do solemnly swear or affirm (as the case may be) that I

any part of the tariffs of charges so filed and published is in any respect unequal or unreasonable, it shall have the power, and it is authorized and directed, to compel any common carrier to change the same and adopt such charge as the

will support the Constitution of the United States and the constitution of the State of Minnesota, and that I will faithfully discharge my duties as secretary of the railroad and warehouse commission of the State of Minnesota, according to the best of my ability; and I further declare that I am not in the employ of, or holding any official relation to, any common carrier or grain warehouseman, within said State; nor am I, in any manner, interested in any stock, bonds or other property of such common carrier or grain warehouseman." The said secretary so appointed and qualified shall enter into bonds to the State of Minnesota, to be approved by the governor in the sum of ten thousand (10,000) dollars, conditioned for the faithful performance of his duty as secretary of such commission, which bond shall be filed with the secretary of state. The commission shall have authority to employ and fix the compensation for such other employés as it may find necessary to the proper performance of its duties, subject to the approval of the governor of the State.

The commissioners shall be furnished with a suitable office and all necessary office supplies. Witnesses summoned before the commission shall be paid the same fees and mileage that are paid witnesses in the district courts of the State.

All the expenses of the commission, including all necessary expenses for transportation incurred by the commissioners or by their employés under their order, in making any investigation in any other place than the city of St. Paul, shall be allowed and paid out of the state treasury on the presentation of itemized vouchers therefor, approved by the chairman of the commission and the state auditor.

SEC. 20. That the sum of fifteen thousand (15,000) dollars is hereby appropriated for the use and purposes of this act for the fiscal year ending July thirty-first (31st), eighteen hundred and eighty-eight (1888), and the sum of fifteen thousand (15,000) dollars is hereby appropriated for the use and purposes of this act for the fiscal year ending July thirty-first (31st), eighteen hundred and eighty-nine (1889).

SEC. 21. That all acts and parts of acts inconsistent herewith are hereby repealed; *Provided*, That the provisions of this act shall apply to and govern the existing railroad and warehouse commissioners appointed by virtue of an act approved March fifth (5th), eighteen hundred and eighty-five (1885), who are hereby clothed with the powers and charged with the duties and responsibilities of this act, granted to and imposed upon the railroad and warehouse commissioners of the State of Minnesota.

SEC. 22. This act shall take effect and be in force from and after its passage.

Approved March 7th, 1887.

commission " shall declare to be equal and reasonable," to which end the commission shall, in writing, inform such carrier in what respect such tariff of charges is unequal and unreasonable, and shall recommend what tariff shall be substituted therefor; that in case the carrier shall neglect for ten days after such notice to adopt such tariff of charges as the commission recommends, it shall be the duty of the latter to immediately publish such tariff as it has declared to be equal and reasonable, and cause it to be posted at all the regular stations on the line of such carrier in Minnesota, and it shall be unlawful thereafter for the carrier to charge a higher or lower rate than that so fixed and published by the commission; and that, if any carrier subject to the provisions of the act shall neglect to publish or file its schedules of charges, or to carry out such recommendation made and published by the commission, it shall be subject to a writ of mandamus "to be issued by any judge of the Supreme Court or of any of the District Courts " of the State, on application of the commission, to compel compliance with the requirements of section 8 and with the recommendation of the commission, and a failure to comply with the requirements of the mandamus shall be punishable as and for contempt, and the commission may apply also to any such judge for an injunction against the carrier from receiving or transporting property or passengers within the State until it shall have complied with the requirements of section 8 and with the recommendation of the commission, and for any wilful violation or failure to comply with such requirements or such recommendation of the commission, the court may award such costs, including counsel fees, by way of penalty, on the return of said writs and after due deliberation thereon, as may be just.

On the 22d of June, 1887, The Boards-of-Trade Union of Farmington, Northfield, Faribault, and Owatonna, in Minnesota, filed with the commission a petition in writing, complaining that the Chicago, Milwaukee & St. Paul Railway Company, being a common carrier engaged in the transportation of property wholly by railroad, for carriage or shipment from Owatonna, Faribault, Dundas, Northfield, and Farmington,

to the cities of St. Paul and Minneapolis, all of those places being within the State of Minnesota, made charges for its services in the transportation of milk from said Owatonna, Faribault, Dundas, Northfield and Farmington to St. Paul and Minneapolis, which were unequal and unreasonable, in that it charged four cents per gallon for the transportation of milk from Owatonna to St. Paul and Minneapolis, and three cents per gallon from Faribault, Dundas, Northfield and Farmington, to the said cities; and that such charges were unreasonably high, and subjected the traffic in milk between said points to unreasonable prejudice and disadvantage. The prayer of the petition was that such rates be declared unreasonable, and the carrier be compelled to change the same and adopt such rates and charges as the commission should declare to be equal and reasonable.

A statement of the complaint thus made was forwarded by the commission, on the 29th of June, 1887, to the railway company, and it was called upon by the commission, on the 6th of July, 1887, to satisfy the complaint or answer it in writing at the office of the commission in St. Paul, on the 13th of July, 1887.

On the 30th of June, 1887, Mr. J. F. Tucker, the assistant general manager of the railway company, addressed a letter from Milwaukee to the secretary of the commission, saying: "I have your favor of the 29th, with complaint as to milk rates being unreasonable and unequal. They may be unequal if unreasonable. They are unreasonably low for the service performed — by passenger train — and are 25 per cent less than the same commodity is charged into New York, with longer distances and hundred times larger volume in favor of New York. I am frank to say it is hard to appreciate complaints from boards of trade that one-tenth of a cent per gallon on milk handled on passenger train one mile is unreasonable. With what is the comparison made that enables such a conclusion? It's not first-class rates by freight train, and was made low to encourage the trade, under the hope and promise that, when the trade were fostered, it would be advanced. This, as usual, has been forgotten."

On the 13th of July, 1887, at the office of the commission

in St. Paul, the company appeared by J. A. Chandler, its duly authorized attorney, and The Boards-of-Trade Union by its attorney, and the commission proceeded to investigate the complaint. An investigation of the rates charged by the company for its services in transporting milk from Owatonna, Faribault, Dundas, Northfield and Farmington, to St. Paul and Minneapolis, was made by the commission, and it found that the charges of the company for transporting milk from Owatonna and Faribault to St. Paul and Minneapolis were three cents per gallon in ten-gallon cans; that such charges were unequal and unreasonable; and that the company's tariff of rates for transporting milk from Owatonna and Faribault to those cities, filed and published by it as provided by chapter 10 of the Laws of 1887, was unequal and unreasonable; and the commission declared that a rate of $2\frac{1}{2}$ cents per gallon in ten-gallon cans was an equal and reasonable rate for such services.

On the 4th of August, 1887, the commission made a report in writing, which included the findings of fact upon which its conclusions were based, its recommendation as to the tariff which should be substituted for the tariff so found to be unequal and unreasonable, and also a specification of the rates and charges which it declared to be equal and reasonable. This paper was in the shape of a communication, dated at St. Paul, August 4, 1887, signed by the secretary of the commission and addressed to the company. It said: "It appearing from your schedule of rates and charges for the transportation of milk over and upon the Iowa and Minnesota Division of your road, that you charge, collect, and receive for the transportation of milk over and upon said line from Owatonna and Faribault to the cities of St. Paul and Minneapolis three cents per gallon, in ten-gallon cans, and from Dundas, Northfield and Farmington to said cities of St. Paul and Minneapolis two and one-half cents per gallon, in cans of like capacity, and complaint having been made that such rates and charges are unequal and unreasonable, and that the services performed by you in such transportation are not reasonably worth the said sums charged therefor; and this commission having there-

upon, pursuant to the provisions of section eight of an act entitled 'An act to regulate common carriers, and creating the Railroad and Warehouse Commission of the State of Minnesota, and defining the duties of such commission in relation to common carriers,' approved March 7, 1887, examined the cause and reasonableness of said complaint, and finding, pursuant to subdivision (e) of said section, that your said tariff of rates, so far as appertains to the transportation of milk to the cities of St. Paul and Minneapolis from the other places above named, and insomuch as said tariff provides for or requires the charging or collection of a greater compensation than two and one-half cents per gallon, is unreasonable and excessive. Therefore said commission recommends and directs that you, the said Chicago, Milwaukee & St. Paul Railway Company, shall alter and change your said schedule by the adoption and substitution of a rate not to exceed two and one-half cents per gallon for the services aforesaid from the cities of Owatonna and Faribault, or either of them, to said St. Paul and Minneapolis. The commission, as at present advised, approves of the custom and arrangement which, it is informed, has been adopted and is now in use by the Minnesota & Northwestern R. R. Co., of collecting two and one-half cents per gallon on all milk transported by it, regardless of distance; but this expression of opinion is no part of the decision, notice, or order in this case."

This report was entered of record, and a copy furnished to the Boards-of-Trade Union, and a copy was also delivered, on the 4th of August, 1887, to the company, with a notice to it to desist from charging or receiving such unequal and unreasonable rates for such services. The commission thus informed the company in writing in what respect such tariff of rates and charges was unequal and unreasonable, and recommended to it in writing what tariff should be substituted therefor, to wit, the tariff so found equal and reasonable by the commission.

The company neglected and refused, for more than ten days after such notice, to substitute or adopt such tariff of charges as was recommended by the commission. The latter

thereupon published the tariff of charges which it had declared to be equal and reasonable, and caused it to be posted at the station of the company in Faribault on the 14th of October, 1887, and at all the regular stations on the line of the company in Minnesota prior to November 12, 1887, and in all things complied with the statute.

The tariff so made, published and posted, was dated October 13, 1887, and was headed: "Chicago, Milwaukee and St. Paul Railway Company. (Iowa and Minnesota division.) Freight Tariff on Milk from Owatonna and Faribault to St. Paul and Minneapolis, taking effect October 15, 1887;" and prescribed a charge of $2\frac{1}{2}$ cents per gallon in ten-gallon cans from either the Owatonna station or the Faribault station to either St. Paul or Minneapolis, to be the legal, equal and reasonable maximum charge and compensation for such service, and declared that the same was in force and effect in lieu and place of the charges and compensation theretofore demanded and received therefor by the company.

On the 6th of December, 1887, the commission, by the attorney general of the State, made an application to the Supreme Court of the State for a writ of mandamus to compel the company to comply with the recommendation made to it by the commission, to change its tariff of rates on milk from Owatonna and Faribault to St. Paul and Minneapolis, and to adopt the rates declared by the commission to be equal and reasonable. The application set forth the proceedings hereinbefore detailed; that the company had refused to carry out the recommendation so made, published and posted by the commission; that it continued to charge three cents per gallon for the transportation of milk in ten-gallon cans from Owatonna and Faribault to St. Paul and Minneapolis; that said charge was unequal, unreasonable and excessive; that $2\frac{1}{2}$ cents per gallon for the transportation by it of milk in ten-gallon cans from Owatonna and Faribault to St. Paul and Minneapolis was the maximum reasonable charge for the service; that any rate therefor in excess of $2\frac{1}{2}$ cents per gallon in ten-gallon cans was unequal, unreasonable and excessive; that three cents per gallon in ten-gallon cans was a higher rate

than was charged for the same distances on passenger trains by any express company or by any other railroad company in Minnesota, engaged in transporting milk to St. Paul or Minneapolis; that 2½ cents per gallon in ten-gallon cans was the highest rate charged for like distances on passenger trains by any such company; that the milk transported by the company to St. Paul and Minneapolis, over its Iowa and Minnesota division, (extending from Calmar, in Iowa, to LeRoy, in Minnesota, and from LeRoy, through Owatonna and Faribault, to St. Paul and Minneapolis,) large quantities of which milk were shipped from Faribault, was so transported by the company on a passenger train which ran daily from Owatonna to St. Paul and Minneapolis; and that the company, by means of such excessive charges, subjected the traffic in milk at Faribault and Owatonna to undue and unreasonable prejudice and disadvantage.

Thereupon, an alternative writ of mandamus was issued by the court, returnable before it on the 14th of December, 1887.

On the 23d of December, 1887, the company filed its return to the alternative writ, in which it set up:

(1) That it was not competent for the legislature of Minnesota to delegate to a commission a power of fixing rates for transportation, and that the act of March 7, 1887, so far as it attempted to confer upon the commission power to establish rates for the transportation of freight and passengers, was void under the constitution of the State;

(2) That the company, as the owner of its railroad, franchises, equipment and appurtenances, and entitled to the possession and beneficial use thereof, was authorized to establish rates for the transportation of freight and passengers, subject only to the provision that such rates should be fair and reasonable; that the establishing of such rates by the State against the will of the company was *pro tanto* a taking of its property, and depriving it thereof, without due process of law, in violation of section 1 of Article 14 of the Amendments to the Constitution of the United States; and that the making of the order of October 13, 1887, was *pro tanto* a

taking, and depriving the company, of its property without due process of law, in violation of said section 1. and therefore void and of no effect;

(3) That the rate of three cents per gallon as a freight for carrying milk in ten-gallon cans on passenger trains from Owatonna and Faribault respectively to St. Paul and Minneapolis was a reasonable, fair and just rate; that the rate of 2½ cents per gallon, in ten-gallon cans, so fixed and established by the commission, was not a reasonable, fair or just compensation to the company for the service rendered; and that the establishing of such rate by the commission, against the will of the company, was *pro tanto* a taking of its property without due process of law, in violation of said section 1.

The case came on for hearing upon the alternative writ and the return, and the company applied for a reference to take testimony on the issue raised by the allegations in the application for the writ and the return thereto, as to whether the rate fixed by the commission was reasonable, fair and just. The court denied the application for a reference, and rendered judgment in favor of the relator and that a peremptory writ of mandamus issue. An application for a reargument was made and denied. The terms of the peremptory writ were directed to be, that the company comply with the requirements of the recommendation and order made by the commission on the 4th of August, 1887, and change its tariff of rates and charges for the transportation of milk from Owatonna and Faribault to St. Paul and Minneapolis, and substitute therefor the tariff recommended, published and posted by the commission, to wit, the rate of 2½ cents per gallon of milk in ten-gallon cans from Owatonna and Faribault to St. Paul and Minneapolis, being the rates published by the commission and declared to be equal and reasonable therefor. Costs were also adjudged against the company. To review this judgment, the company brought a writ of error.

*Mr. John W. Cary* for plaintiff in error.

I. The court erred in holding that the legislature of Minnesota, either by positive statute or acting through a railroad

commission, is authorized to make, fix and establish the rates and charges for the transportation of persons and property over lines of railway owned by this company and in denying the right of the company, under the Constitution of the United States, to make, fix and establish its rates and charges over its railway, subject, only, to the provision that such rates and charges shall be fair, just and reasonable:

*First.* Because the exercise of such a power would impair the obligation of the contract contained in the charter under which said road was constructed.

The charter granted in 1856 was a contract between the Territory of Minnesota and the company organized by said charter; and the State of Minnesota, succeeding to the Territory on its admission to statehood, was subject to its provisions.

The road was constructed in pursuance of the charter. The plaintiff in error has succeeded to the ownership of the property and all the rights, franchises and privileges granted by the charter under the laws of the State of Minnesota. Any legislation of the State impinging upon the rights, franchises and privileges granted thereby, is an impairment of the obligation of the contract so made, which the plaintiff in error may lawfully resist.

There is no provision in the charter or in any general statute reserving to the Territory or State of Minnesota the right to alter, amend or repeal said charter, and it remains in full force according to the terms of the grant.

The language in the *Dartmouth College Case,* 4 Wheat. 518, conferring upon the board of trustees power to fill vacancies in their own number, is no more explicit than is the language of this charter; yet this court held that it was a contract that could not be violated or impaired by the legislature fifty years subsequently, and held it an affirmative grant of power for all time, that could not be interfered with.

The cases cited by the Chief Justice in *Stone* v. *Farmers' Loan & Trust Co.,* 116 U. S. 307, on pages 326 and 327, are not authorities to justify the court in holding the language of the charter in this respect not a contract.

The case of *Providence Bank* v. *Billings*, 4 Pet. 514, was a contention, that a state bank chartered by a legislature was not subject to taxation. There was no provision of any kind in the charter upon that subject, and it was claimed that such an institution could not be taxed on general principles.

*Charles River Bridge* v. *Warren Bridge*, 11 Pet. 419, was a contention that the legislature, having chartered one bridge, was not authorized to charter another over Charles River, between Boston and Cambridge, because it would injure the property interests of the first. There was no claim that the first charter contained any such restriction, or any affirmative grant that it should have a monopoly of the business.

In *Minot* v. *Philadelphia, Wilmington & Baltimore Railroad*, 18 Wall. 206, the court held, that the provision of the charter, requiring the railroad company to pay annually into the treasury of the State a tax of one quarter of one per cent on its capital stock, without any words indicating the intent of the legislature, that such payment should be in lieu of all other taxation, and that no further or different tax should be subsequently levied for any purpose, was not sufficient to show a contract binding the State not to levy any other taxes for any other purpose.

In *Bailey* v. *Magwire*, 22 Wall. 215, the Missouri Pacific Railroad was exempted from taxation until completed, and it was provided that after its completion, it should be subject to taxation at the rate assessed by the State on other real and personal property of like value. The contention was that under this statute only a state tax could be levied upon the road; but the court held that the provision had no such effect, that it could be taxed as other property for all purposes.

In *Fertilizing Company* v. *Hyde Park*, 97 U. S. 659, the majority of the court held, that the charter of a company authorized to carry on business at a certain place did not allow it to carry on and continue that business after it became a nuisance.

In *Newton* v. *Commissioners*, 100 U. S. 548, this court held, that the term "permanently established," used in statutes of Western States, relating to establishing county seats, did not

mean that the county seat where it was so "permanently established" should forever remain, but only that it was permanently instead of temporarily established as provided in said statutes.

In no one of these cases, unless it be that of the *Fertilizing Company* in 97 U. S., was there any affirmative grant of power to the company by the legislature in question. They were cases in which it was claimed that by inference or construction such affirmative grant or contract was implied, and in the case of the Fertilizing Company, Mr. Justice Swayne, on page 666, states the rule as follows: "The rule of construction in this class of cases is that it shall be most strongly against the corporation. Every reasonable doubt is to be resolved adversely to the corporation. Nothing is to be taken as conceded except what is given in unmistakable terms or by an implication equally clear. *The affirmative must be shown.* Silence is negation and doubt is fatal to the claim."

Applying this most stringent rule of construction to this charter, and it must still be held that it affirmatively creates a contract between the Territory and the company.

*Second.* The judgment of the court violates the natural right which belongs to every one to fix the price of his services and of his property or its use. Under our form of constitutional government it has ever been held to be the unquestionable right of every freeman to have a perfect and entire property in his goods and estate. 1 Kent Com. 613.

As was said by Lord Ellenborough in *Aldnut* v. *Inglis*, 12 East, 527, in speaking of the right of an owner to charge an unreasonable amount for the use of his warehouse: "There is no doubt that the general principle is favored, both in law and justice, that every man may fix what price he pleases upon his own property or the use of it."

In the case of *The State Freight Tax*, 15 Wall, 232, 277, 278, Mr. Justice Strong, in delivering the opinion of the court, says: "We concede the right and power . . . of the owners of artificial highways, whether such owners be the State or grantees of franchises from the State, to exact what they please for the use of their ways. That right is an attri-

bute of ownership. . . . The right to make terms for the use of the roadway is in the grantee of the franchises, not in the grantor."

The State has no more right to assume the control or management of one of these classes of property than it has of the other, and the right to fix the price of the use of each, inheres in the owner thereof the same in one case as the other, except as above stated, and within the bounds of reasonable compensation, the right of the owner to fix the charges for the use of property clothed by law with a public interest cannot be questioned any more than his right to property not so clothed.

By the authorities cited in the opinion of the Chief Justice in *Munn* v. *Illinois*, 94 U. S., it appears, that the only limitation upon the right of the owner of this sort of property to make his own rates was, that he should charge only a reasonable price for the use of such property, and no claim was made that the legislature had a right to fix such charges. But see *Aldnut* v. *Inglis*, 12 East, 527; *Bolt* v. *Stennett*, 8 T. R. 606.

The *Granger Cases*, so called, reported in 94 U. S., arose on statutes passed in Illinois in 1873, and in Wisconsin, Iowa and Minnesota in 1874. The Wisconsin and Iowa acts were statutes fixing a maximum tariff. The Illinois and Minnesota statutes provided that commissioners should make schedules which should be *prima facie* reasonable rates.

The particular questions involved in the present record aside from the general question of power of the legislature, were not in any of the cases then before the court, except that of *Chicago, Milwaukee &c. Railroad Company* v. *Ackley*, which, it would appear from the opinion, received but slight attention from the court.

Fully admitting the right of the legislature to take such proper action as may be necessary to secure to the people reasonable charges for transportation thereon, we deny its right to arbitrarily and finally fix or determine such charges by positive statute, and most respectfully ask this court to again review the decisions made in the cases of Munn, Peik and Ackley in this respect.

That the police power of the State, founded upon the maxim *sic utere tuo ut alienum non laedas,* is proper authority for statutes regulating the management, operation and control of a railroad so far as it affects the protection of the lives, limbs, comfort, safety and quiet of all persons, and the protection of all property in the State, is admitted.

But we deny that this power gives to the legislature the right to limit or fix the tolls or charges for transportation which the company would otherwise have the right to make.

*Thorpe* v. *Rutland & Burlington Railroad Co.,* 27 Vermont, 140; *S. C.* 62 Am. Dec. 625; Hale's De Portibus Maris; Cooley's Const. Lim. 88, 91; *People* v. *Draper,* 15 N. Y. 532; *Wynehamer* v. *People,* 13 N. Y. 378; *Aldnut* v. *Inglis, ubi sup.;* Tiedman's Limitation of Police Powers, 231; *Parker* v. *Metropolitan Railway,* 109 Mass. 506; 1 Bl. Com. 160; *Newland* v. *Marsh,* 19 Illinois, 376; *Ervine's Appeal,* 16 Penn. St. 256; *S. C.* 55 Am. Dec. 499.

II. The court erred in holding that the schedules of rates fixed by said commission were final and conclusive as to what were lawful, equal and reasonable rates, and that they " are the only ones that are lawful, and therefore, in contemplation of law, the only ones that are equal and reasonable," instead of simply holding them as advisory and *prima facie* or presumptively equal, and subject to review by the court.

III. The court erred in holding that the rate fixed by said commission, which is not a fair or reasonable rate or just compensation to the owner for the service required, was a lawful rate which the owner was bound to submit to and obey, and in granting a peremptory writ of mandamus compelling the owner to transport freight over its line of railway at the rate so fixed.

IV. The court erred in holding that the State of Minnesota, since the passage by Congress of an act entitled " An Act to regulate Commerce," approved February 4, 1887, has the power to regulate, fix, or establish the tariff rates for the transportation of freight and passengers over the lines of the Chicago, Milwaukee & St. Paul Railway, it being an interstate railway engaged in interstate traffic.

*Mr. Moses E. Clapp* and *Mr. H. W. Childs*, for defendant in error, after discussing a question concerning the jurisdiction of the court below, continued:

It remains to inquire whether the law in question, as interpreted by the Supreme Court of Minnesota, is in conflict with the Fourteenth Amendment to the Federal Constitution, and in considering this law, as interpreted by the state court we should keep in mind that, while the Supreme Court of the State held that the reasonableness of the rates as fixed by the commission, could not be the subject of judicial review, yet it did not leave the commission an irresponsible body, answerable in no case to the courts, but on the contrary limited its power to the exercise of an honest judgment.

It will relieve the discussion of this case from some embarrassment, if it is borne in mind that, in the case made by plaintiff in error to the alternative writ, no allegations are made that the enforcing the rate established by the board would so affect the earnings of the road as to impair its ability to meet any of its obligations or to seriously affect its revenues.

Neither is it claimed by plaintiff in error that it is protected by any express contract or charter exemption from legislative interference in the matter of fixing rates, the company contenting itself as above stated, with the allegation that the commission "unjustly, unreasonably and oppressively" fixed the rate, and that the establishment of such rate was a *pro tanto* taking of the property of the plaintiff in error.

This case then involves a determination of the question, can the legislature prescribe what is a reasonable rate for transportation of freight and passengers by a common carrier, when unrestrained by any provision in the charter of the company?

In view of the repeated adjudications of this court sustaining the right of legislatures to establish the rates which common carriers may charge, and to declare by legislative action what are reasonable rates, we confess to some hesitation in entering upon an extended discussion of the question.

In *Munn* v. *Illinois*, 94 U. S. 113, 133, 134, in the opinion of

the late Chief Justice Waite, is to be found a history of legis-
lative control of property clothed with public interest, as well
as also an exhaustive discussion of the principles upon which
such legislative control rests.

In the consideration of the questions involved in that case,
the court, after reviewing the history of the subject and
supporting the position contended for by ample and pertinent
illustrations, says:

"It is insisted, however, that the owner of property is en-
titled to a reasonable compensation for its use, even though it
be clothed with a public interest, and that what is reasonable
is a judicial and not a legislative question.

"As has already been shown, the practice has been other-
wise. In countries where the common law prevails, it has
been customary from time immemorial for the legislature to
declare what shall be a reasonable compensation under such
circumstances, or, perhaps more properly speaking, to fix a
maximum beyond which any charge made would be unreason-
able. Undoubtedly in mere private contracts, relating to
matters in which the public has no interest, what is reasonable
must be ascertained judicially. But this is because the legis-
lature has no control over such a contract. So, too, in matters
which do affect the public interest, and as to which legis-
lative control may be exercised, if there are no statutory regu-
lations upon the subject, the courts must determine what is
reasonable. The controlling fact is the power to regulate at
all. If that exists, the right to establish the maximum of
charge, as one of the means of regulation, is implied. In fact,
the common-law rule, which requires the charge to be reason-
able, is itself a regulation as to price. Without it, the owner
could make his rates at will, and compel the public to yield to
his terms, or forego the use.

"But a mere common-law regulation of trade or business may
be changed by statute. A person has no property, no vested
interest, in any rule of the common law. That is only one of
the forms of municipal law, and is no more sacred than the
other. Rights of property which have been created by the
common law cannot be taken away without due process; but

the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances. To limit the rate of charge for services rendered in a public employment, or for the use of property in which the public has an interest, is only changing a regulation which existed before. It establishes no new principle in the law, but only gives a new effect to an old one.

" We know that this is a power which may be abused; but this is no argument against its existence. For protection against abuses by legislatures the people must resort to the polls, not to the courts."

See, also, *Chicago, Burlington & Quincy Railroad* v. *Iowa*, 94 U. S. 155; *Peik* v. *Chicago & Northwestern Railway*, 94 U. S. 164; *Chicago, Milwaukee & St. Paul Railroad* v. *Ackley*, 94 U. S. 179; *Winona & St. Peter Railroad* v. *Blake*, 94 U. S. 180.

In *Ruggles* v. *Illinois*, 108 U. S. 526, 531, the court, citing and referring to the *Granger Cases*, says: " It was determined that a 'State may limit the amount of charges by railroad companies for fares and freights unless restrained by some contract in the charter.' . . . The company by its original charter was authorized to transport passengers and property and to receive compensation therefor. This, if there had been nothing more, would, under the rule stated in *Munn* v. *Illinois*, 94 U. S. 113, and the several railroad cases decided at the same time, require the company to carry at reasonable rates and leave the legislature at liberty to fix the maximum of what would be reasonable."

Discussing the effect of a provision of its charter, as amended, which empowered the board of directors to fix rates, the court says, page 533: " When, therefore, in a section of the charter which expressly declares that no by-law shall be made that is in conflict with the laws of the State, we find that the rates of charge to be levied and collected for the conveyance of persons and property are to be regulated by by-

laws, the conclusion is irresistible that only such charges can be collected as are allowed by the laws of the State. This implies that, in the absence of direct legislation on the subject, the power of the directors over the rates is subject only to the common law limitation of reasonableness; for in the absence of a statute or other appropriate indication of the legislative will, the common law forms part of the laws of the State, to which the corporate by-laws must conform. But since, in the absence of some restraining contract, the State may establish a maximum of rates to be charged by railroad companies for the transportation of persons and property, it follows that when a maximum is so established the rates fixed by the directors must conform to its requirements, otherwise the by-laws will be repugnant to the laws." · Instead of *Ruggles* v. *Illinois* modifying the rule laid down in the *Granger Cases*, we insist that it is a plain affirmance of that rule.

Another case which it was urged modified the rule in the *Granger Cases* is the case of *Stone* v. *Farmers' Loan & Trust Co.*, 116 U. S. 307; after referring to the *Granger Cases*, the court says:

"From what has been said, it is not to be inferred that this power of limitation or regulation is itself without limit. This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretence of regulating fares and freights, the State cannot require a railroad corporation to carry persons or property without reward; neither can it do that which in law amounts to a taking of private property for public use without just compensation, or without due process of law. What would have this effect we need not now say, because no tariff has yet been fixed by the commission, and the statute of Mississippi expressly provides 'that in all trials of cases brought for a violation of any tariff of charges, as fixed by the commission, it may be shown in defence that such tariff so fixed is unjust.'"

The principles here expressed will doubtless be pressed upon the court with great force, it being insisted that in the case at bar the rates have been fixed, but it may be said in reply that in nearly all the *Granger Cases*, the court was called upon to pass upon a law which had in fact fixed a rate.

However, as stated in the outset, the return to the writ of mandamus in the case at bar contains no allegations that could support a claim that the operation of the law would require the carrier to transport persons or property without reward, or would amount to a taking of private property for public use without just compensation. The most that is alleged is that the rate so established is unjust and unreasonable, and the statement in general terms that it amounts to a *pro tanto* taking of the property of the company without due process of law. But as was said by the court in the case last cited:

"General statutes regulating the use of railroads in a State, or fixing maximum rates of charges for transportation, when not forbidden by charter contracts, do not necessarily deprive the corporation, owning or operating a railroad within the State, of its property without due process of law, within the meaning of the Fourteenth Amendment of the Constitution of the United States, nor take away from the corporation the equal protection of the laws." *Munn* v. *Illinois*, 94 U. S. 113; 134, 135; *Railroad Co.* v. *Richmond*, 96 U. S. 521, 529; *Spring Valley Water Works* v. *Schottler*, 110 U. S. 347, 354.

In *Dow* v. *Beidelman*, 125 U. S. 680, the court says, concerning a law of Arkansas fixing a maximum rate for carrying passengers: "Without any proof of the sum invested by the reorganized corporation, or its trustees, the court has no means, if it would under any circumstances have the power, of determining that the rate of three cents a mile fixed by the legislature is unreasonable. Still less does it appear that there has been any such confiscation as amounts to a taking of property without due process of law."

In *Georgia Banking Co.* v. *Smith*, 128 U. S. 174, the principle contended for again received judicial sanction.

Thus we have an unbroken line of decisions of this court commencing with the case of *Munn* v. *Illinois*, decided in 1876, and terminating with the case of *Georgia Railroad & Banking Co.* v. *Smith*, decided in 1888, to support the proposition that when unrestrained by contract or charter stipulation, the legislature of a State may determine what is a just

and reasonable rate for a common carrier to charge for the transportation of freight and passengers; that the question of the reasonableness of the rate is a question for legislative determination, and when so determined, ceases to be the subject of judicial inquiry.

*Mr. W. C. Goudy* closed for appellant.

MR. JUSTICE BLATCHFORD, after stating the case as above reported, delivered the opinion of the court.

The opinion of the Supreme Court of Minnesota is reported in 38 Minnesota, 281. In it the court in the first place construed the statute on the question as to whether the court itself had jurisdiction to entertain the proceeding, and held that it had. Of course, we cannot review this decision.

It next proceeded to consider the question as to the nature and extent of the powers granted to the commission by the statute in the matter of fixing the rates of charges. On that subject it said: "It seems to us that, if language means anything, it is perfectly evident that the expressed intention of the legislature is that the rates recommended and published by the commission (assuming that they have proceeded in the manner pointed out by the act) should be not simply advisory, nor merely *prima facie* equal and reasonable, but final and conclusive as to what are lawful or equal and reasonable charges; that, in proceedings to compel compliance with the rates thus published, the law neither contemplates nor allows any issue to be made or inquiry had as to their equality and reasonableness in fact. Under the provisions of the act, the rates thus published are the only ones that are lawful, and therefore, in contemplation of law, the only ones that are equal and reasonable; and, hence, in proceedings like the present, there is, as said before, no fact to traverse, except the violation of the law in refusing compliance with the recommendations of the commission. Indeed, the language of the act is so plain on that point that argument can add nothing to its force."

It then proceeded to examine the question of the validity of the act under the constitution of Minnesota, as to whether the legislature was authorized to confer upon the commission the powers given to the latter by the statute. It held that, as the legislature had the power itself to regulate charges by railroads, it could delegate to a commission the power of fixing such charges, and could make the judgment or determination of the commission as to what were reasonable charges final and conclusive.

The Chicago, Milwaukee and St. Paul Railway Company is a corporation organized under the laws of Wisconsin. The line of railroad owned and operated by it in the present case extends from Calmar, in Iowa, to LeRoy, in Minnesota, and from Leroy, through Owatonna and Faribault, to St. Paul and Minneapolis, the line from Calmar to St. Paul and Minneapolis being known as the "Iowa and Minnesota Division," and being wholly in Minnesota from the point where it crosses the state line between Iowa and Minnesota. It was constructed under a charter granted by the Territory of Minnesota to the Minneapolis and Cedar Valley Railroad Company, by an act approved March 1, 1856, Laws of 1856, c. 166, p. 325, to construct a railroad from the Iowa line, at or near the crossing of said line by the Cedar River, through the valley of Strait River to Minneapolis. Section 9 of that act provided that the directors of the corporation should have power to make all needful rules, regulations and by-laws touching "the rates of toll and the manner of collecting the same;" and section 13, that the company should have power to unite its railroad with any other railroad which was then, or thereafter might be, constructed in the Territory of Minnesota, or adjoining States or Territories, and should have power to consolidate its stock with any other company or companies.

By an act passed March 3, 1857, c. 99, (11 Stat. 195,) the Congress of the United States made a grant of land to the Territory of Minnesota to aid in constructing certain railroads. By an act of the legislature of the Territory, approved May 22, 1857, (Laws of 1857, extra session, p. 20,) a portion of such grant was conferred upon the Minneapolis and Cedar Valley

Railroad Company. Subsequently, in 1860, the State of Minnesota, by proper proceedings, became the owner of the rights, franchises and property of that company. By an act approved March 10, 1862, c. 17, (Special Laws of 1862, p. 226,) the State incorporated the Minneapolis, Faribault and Cedar Valley Railroad Company, and conveyed to it all the franchises and property of the Minneapolis and Cedar Valley Railroad Company which the State had so acquired ; and by an act approved February 1, 1864, (Special Laws of 1864, p. 164,) the name of the Minneapolis, Faribault and Cedar Valley Railroad Company was changed to that of the Minnesota Central Railway Company. That company constructed the road from Minneapolis and St. Paul to LeRoy, in Minnesota; and the road from LeRoy to Calmar, in Iowa, and thence to McGregor, in the latter State, was consolidated with it. In August, 1867, the entire road from McGregor, by way of Calmar, LeRoy, Austin, Owatonna and Faribault, to St. Paul and Minneapolis, was conveyed to the Chicago, Milwaukee and St. Paul Railway Company, which succeeded to all the franchises so granted to the Minneapolis and Cedar Valley Railroad Company.

It is contended for the railway company that the State of Minnesota is bound by the contract made by the Territory in the charter granted to the Minneapolis and Cedar Valley Railroad Company; that a contract existed that the company should have the power of regulating its rates of toll; that any legislation by the State infringing upon that right impairs the obligation of the contract; that there was no provision in the charter or in any general statute reserving to the Territory or to the State the right to alter or amend the charter; and that no subsequent legislation of the Territory or of the State could deprive the directors of the company of the power to fix its rates of toll, subject only to the general provision of law that such rates should be reasonable.

But we are of opinion that the general language of the ninth section of the charter of the Minneapolis and Cedar Valley Railroad Company cannot be held to constitute an irrepealable contract with that company that it should have the right for all future time to prescribe its rates of toll, free from all control by the legislature of the State.

It was held by this court in *Pennsylvania Railroad Co.* v. *Miller*, 132 U. S. 75, in accordance with a long course of decisions both in the state courts and in this court, that a railroad corporation takes its charter, containing a kindred provision with that in question, subject to the general law of the State, and to such changes as may be made in such general law, and subject to future constitutional provisions and future general legislation, in the absence of any prior contract with it exempting it from liability to such future general legislation in respect of the subject matter involved; and that exemption from future general legislation, either by a constitutional provision or by an act of the legislature, cannot be admitted to exist unless it is given expressly, or unless it follows by an implication equally clear with express words.

There is nothing in the mere grant of power, by section 9 of the charter, to the directors of the company, to make needful rules and regulations touching the rates of toll and the manner of collecting the same, which can be properly interpreted as authorizing us to hold that the State parted with its general authority itself to regulate, at any time in the future when it might see fit to do so, the rates of toll to be collected by the company.

In *Stone* v. *Farmers' Loan and Trust Co.*, 116 U. S. 307, 325, the whole subject is fully considered, the authorities are cited, and the conclusion is arrived at, that the right of a State reasonably to limit the amount of charges by a railroad company for the transportation of persons and property within its jurisdiction cannot be granted away by its legislature, unless by words of positive grant or words equivalent in law; and that a statute which grants to a railroad company the right "from time to time to fix, regulate and receive the tolls and charges by them to be received for transportation," does not deprive the State of its power, within the limits of its general authority, as controlled by the Constitution of the United States, to act upon the reasonableness of the tolls and charges so fixed and regulated. But, after reaching this conclusion, the court said (p. 331): "From what has thus been said, it is not to be inferred that this power of limitation or

regulation is itself without limit. This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretence of regulating fares and freights, the State cannot require a railroad corporation to carry persons or property without reward; neither can it do that which in law amounts to a taking of private property for public use without just compensation, or without due process of law."

There being, therefore, no contract or chartered right in the railroad company which can prevent the legislature from regulating in some form the charges of the company for transportation, the question is whether the form adopted in the present case is valid.

The construction put upon the statute by the Supreme Court of Minnesota must be accepted by this court, for the purposes of the present case, as conclusive and not to be reëxamined here as to its propriety or accuracy. The Supreme Court authoritatively declares that it is the expressed intention of the legislature of Minnesota, by the statute, that the rates recommended and published by the commission, if it proceeds in the manner pointed out by the act, are not simply advisory, nor merely *prima facie* equal and reasonable, but final and conclusive as to what are equal and reasonable charges; that the law neither contemplates nor allows any issue to be made or inquiry to be had as to their equality or reasonableness in fact; that, under the statute, the rates published by the commission are the only ones that are lawful, and, therefore, in contemplation of law the only ones that are equal and reasonable; and that, in a proceeding for a mandamus under the statute, there is no fact to traverse except the violation of law in not complying with the recommendations of the commission. In other words, although the railroad company is forbidden to establish rates that are not equal and reasonable, there is no power in the courts to stay the hands of the commission, if it chooses to establish rates that are unequal and unreasonable.

This being the construction of the statute by which we are bound in considering the present case, we are of opinion that, so construed, it conflicts with the Constitution of the United

States in the particulars complained of by the railroad company. It deprives the company of its right to a judicial investigation, by due process of law, under the forms and with the machinery provided by the wisdom of successive ages for the investigation judicially of the truth of a matter in controversy, and substitutes therefor, as an absolute finality, the action of a railroad commission which, in view of the powers conceded to it by the state court, cannot be regarded as clothed with judicial functions or possessing the machinery of a court of justice.

Under section 8 of the statute, which the Supreme Court of Minnesota says is the only one which relates to the matter of the fixing by the commission of general schedules of rates, and which section, it says, fully and exclusively provides for that subject, and is complete in itself, all that the commission is required to do is, on the filing with it by a railroad company of copies of its schedules of charges, to "find" that any part thereof is in any respect unequal or unreasonable, and then it is authorized and directed to compel the company to change the same and adopt such charge as the commission "shall declare to be equal and reasonable," and, to that end, it is required to inform the company in writing in what respect its charges are unequal and unreasonable. No hearing is provided for, no summons or notice to the company before the commission has found what it is to find and declared what it is to declare, no opportunity provided for the company to introduce witnesses before the commission, in fact, nothing which has the semblance of due process of law; and although, in the present case, it appears that, prior to the decision of the commission, the company appeared before it by its agent, and the commission investigated the rates charged by the company for transporting milk, yet it does not appear what the character of the investigation was or how the result was arrived at.

By the second section of the statute in question, it is provided that all charges made by a common carrier for the transportation of passengers or property shall be equal and reasonable. Under this provision, the carrier has a right to make equal and reasonable charges for such transportation.

In the present case, the return alleged that the rate of charge fixed by the commission was not equal or reasonable, and the Supreme Court held that the statute deprived the company of the right to show that judicially. The question of the reasonableness of a rate of charge for transportation by a railroad company, involving as it does the element of reasonableness both as regards the company and as regards the public, is eminently a question for judicial investigation, requiring due process of law for its determination. If the company is deprived of the power of charging reasonable rates for the use of its property, and such deprivation takes place in the absence of an investigation by judicial machinery, it is deprived of the lawful use of its property, and thus, in substance and effect, of the property itself, without due process of law and in violation of the Constitution of the United States; and in so far as it is thus deprived, while other persons are permitted to receive reasonable profits upon their invested capital, the company is deprived of the equal protection of the laws.

It is provided by section 4 of article 10 of the constitution of Minnesota of 1857, that "lands may be taken for public way, for the purpose of granting to any corporation the franchise of way for public use," and that "all corporations, being common carriers, enjoying the right of way in pursuance to the provisions of this section, shall be bound to carry the mineral, agricultural and other productions and manufactures on equal and reasonable terms." It is thus perceived that the provision of section 2 of the statute in question is one enacted in conformity with the constitution of Minnesota.

The issuing of the peremptory writ of mandamus in this case was, therefore, unlawful, because in violation of the Constitution of the United States; and it is necessary that the relief administered in favor of the plaintiff in error should be a reversal of the judgment of the Supreme Court awarding that writ, and an instruction for further proceedings by it not inconsistent with the opinion of this court.

In view of the opinion delivered by that court, it may be impossible for any further proceedings to be taken other than to dismiss the proceeding for a mandamus, if the

court should adhere to its opinion that, under the statute, it cannot investigate judicially the reasonableness of the rates fixed by the commission. Still, the question will be open for review; and

> *The judgment of this court is, that the judgment of the Supreme Court of Minnesota, entered May 4, 1888, awarding a peremptory writ of mandamus in this case, be reversed, and the case be remanded to that court, with an instruction for further proceedings not inconsistent with the opinion of this court.*

MR. JUSTICE MILLER concurring.

I concur with some hesitation in the judgment of the court, but wish to make a few suggestions of the principles which I think should govern this class of questions in the courts. Not desiring to make a dissent, nor a prolonged argument in favor of any views I may have, I will state them in the form of propositions.

1. In regard to the business of common carriers limited to points within a single State, that State has the legislative power to establish the rates of compensation for such carriage.

2. The power which the legislature has to do this can be exercised through a commission which it may authorize to act in the matter, such as the one appointed by the legislature of Minnesota by the act now under consideration.

3. Neither the legislature nor such commission acting under the authority of the legislature, can establish arbitrarily and without regard to justice and right a tariff of rates for such transportation, which is so unreasonable as to practically destroy the value of property of persons engaged in the carrying business on the one hand, nor so exorbitant and extravagant as to be in utter disregard of the rights of the public for the use of such transportation on the other.

4. In either of these classes of cases there is an ultimate remedy by the parties aggrieved, in the courts, for relief against such oppressive legislation, and especially in the courts of the United States, where the tariff of rates established

either by the legislature or by the commission is such as to deprive a party of his property without due process of law.

5. But until the judiciary has been appealed to to declare the regulations made, whether by the legislature or by the commission, voidable for the reasons mentioned, the tariff of rates so fixed is the law of the land, and must be submitted to both by the carrier and the parties with whom he deals.

6. That the proper, if not the only, mode of judicial relief against the tariff of rates established by the legislature or by its commission, is by a bill in chancery asserting its unreasonable character and its conflict with the Constitution of the United States, and asking a decree of court forbidding the corporation from exacting such fare as excessive, or establishing its right to collect the rates as being within the limits of a just compensation for the service rendered.

7. That until this is done it is not competent for each individual having dealings with the carrying corporation, or for the corporation with regard to each individual who demands its services, to raise a contest in the courts over the questions which ought to be settled in this general and conclusive method.

8. But in the present case, where an application is made to the Supreme Court of the State to compel the common carriers, namely, the railroad companies, to perform the services which their duty requires them to do for the general public, which is equivalent to establishing by judicial proceeding the reasonableness of the charges fixed by the commission, I think the court has the same right and duty to inquire into the reasonableness of the tariff of rates established by the commission before granting such relief, that it would have if called upon so to do by a bill in chancery.

9. I do not agree that it was necessary to the validity of the action of the commission that previous notice should have been given to all common carriers interested in the rates to be established, nor to any particular one of them, any more than it would have been necessary, which I think it is not, for the legislature to have given such notice if it had established such rates by legislative enactment.

10. But when the question becomes a judicial one, and the validity and justice of these rates are to be established or rejected by the judgment of a court, it is necessary that the railroad corporations interested in the fare to be considered should have notice and have a right to be heard on the question relating to such fare, which I have pointed out as judicial questions. For the refusal of the Supreme Court of Minnesota to receive evidence on this subject, I think the case ought to be reversed on the ground that this is a denial of due process of law in a proceeding which takes the property of the company, and if this be a just construction of the statute of Minnesota it is for that reason void.

MR. JUSTICE BRADLEY (with whom concurred MR. JUSTICE GRAY and MR. JUSTICE LAMAR) dissenting.

I cannot agree to the decision of the court in this case. It practically overrules *Munn* v. *Illinois*, 94 U. S. 113, and the several railroad cases that were decided at the same time. The governing principle of those cases was that the regulation and settlement of the fares of railroads and other public accommodations is a legislative prerogative and not a judicial one. This is a principle which I regard as of great importance. When a railroad company is chartered, it is for the purpose of performing a duty which belongs to the State itself. It is chartered as an agent of the State for furnishing public accommodation. The State might build its railroads if it saw fit. It is its duty and its prerogative to provide means of intercommunication between one part of its territory and another. And this duty is devolved upon the legislative department. If the legislature commissions private parties, whether corporations or individuals, to perform this duty, it is its prerogative to fix the fares and freights which they may charge for their services. When merely a road or a canal is to be constructed, it is for the legislature to fix the tolls to be paid by those who use it; when a company is chartered not only to build a road, but to carry on public transportation upon it, it is for the legislature to fix the charges for such transportation.

But it is said that all charges should be reasonable, and that none but reasonable charges can be exacted; and it is urged that what is a reasonable charge is a judicial question. On the contrary, it is preëminently a legislative one, involving considerations of policy as well as of remuneration; and is usually determined by the legislature, by fixing a maximum of charges in the charter of the company, or afterwards, if its hands are not tied by contract. If this maximum is not exceeded, the courts cannot interfere. When the rates are not thus determined, they are left to the discretion of the company, subject to the express or implied condition that they shall be reasonable; express, when so declared by statute; implied, by the common law, when the statute is silent; and the common law has effect by virtue of the legislative will.

. Thus, the legislature either fixes the charges at rates which it deems reasonable; or merely declares that they shall be reasonable; and it is only in the latter case, where what is reasonable is left open, that the courts have jurisdiction of the subject. I repeat: When the legislature declares that the charges shall be reasonable, or, which is the same thing, allows the common law rule to that effect to prevail; and leaves the matter there; then resort may be had to the courts to inquire judicially whether the charges are reasonable. Then, and not till then, is it a judicial question. But the legislature has the right, and it is its prerogative, if it chooses to exercise it, to declare what is reasonable.

This is just where I differ from the majority of the court. They say in effect, if not in terms, that the final tribunal of arbitrament is the judiciary; I say it is the legislature. I hold that it is a legislative question, not a judicial one, unless the legislature or the law, (which is the same thing,) has made it judicial, by prescribing the rule that the charges shall be reasonable, and leaving it there.

It is always a delicate thing for the courts to make an issue with the legislative department of the government, and they should never do so if it is possible to avoid it. By the decision now made we declare, in effect, that the judiciary, and not the legislature, is the final arbiter in the regulation of fares and

freights of railroads and the charges of other public accommodations. It is an assumption of authority on the part of the judiciary which, it seems to me, with all due deference to the judgment of my brethren, it has no right to make. The assertion of jurisdiction by this court makes it the duty of every court of general jurisdiction, state or federal, to entertain complaints against the decisions of the boards of commissioners appointed by the States to regulate their railroads; for all courts are bound by the Constitution of the United States, the same as we are. Our jurisdiction is merely appellate.

The incongruity of this position will appear more distinctly by a reference to the nature of the cases under consideration. The question presented before the commission in each case was one relating simply to the reasonableness of the rates charged by the companies, — a question of more or less. In the one case the company charged three cents per gallon for carrying milk between certain points. The commission deemed this to be unreasonable, and reduced the charge to 2½ cents. In the other case the company charged $1.25 per car for handling and switching empty cars over its lines within the city of Minneapolis, and $1.50 for loaded cars; and the commission decided that $1.00 per car was a sufficient charge in all cases. The companies complain that the charges as fixed by the commission are unreasonably low, and that they are deprived of their property without due process of law; that they are entitled to a trial by a court and jury, and are not barred by the decisions of a legislative commission. The state court held that the legislature had the right to establish such a commission, and that its determinations are binding and final, and that the courts cannot review them. This court now reverses that decision, and holds the contrary. In my judgment the state court was right, and the establishment of the commission, and its proceedings, were no violation of the constitutional prohibition against depriving persons of their property without due process of law.

I think it is perfectly clear, and well settled by the decisions of this court, that the legislature might have fixed the rates in question. If it had done so, it would have done it through

the aid of committees appointed to investigate the subject, to acquire information, to cite parties, to get all the facts before them, and finally to decide and report. No one could have said that this was not due process of law. And if the legislature itself could do this, acting by its committees, and proceeding according to the usual forms adopted by such bodies, I can see no good reason why it might not delegate the duty to a board of commissioners, charged, as the board in this case was, to regulate and fix the charges, so as to be equal and reasonable. Such a board would have at its command all the means of getting at the truth and ascertaining the reasonableness of fares and freights, which a legislative committee has. It might, or it might not, swear witnesses and examine parties. Its duties being of an administrative character, it would have the widest scope for examination and inquiry. All means of knowledge and information would be at its command, — just as they would be at the command of the legislature which created it. Such a body, though not a court, is a proper tribunal for the duties imposed upon it.

In the case of *Davidson* v. *City of New Orleans*, 96 U. S. 97, we decided that the appointment of a board of assessors for assessing damages was not only due process of law, but the proper method for making assessments to distribute the burden of a public work amongst those who are benefited by it. No one questions the constitutionality or propriety of boards for assessing property for taxation, or for the improvement of streets, sewers and the like, or of commissions to establish county seats, and for doing many other things appertaining to the administrative management of public affairs. Due process of law does not always require a court. It merely requires such tribunals and proceedings as are proper to the subject in hand. In the *Railroad Commission Cases*, 116 U. S. 307, we held that a board of commissioners is a proper tribunal for determining the proper rates of fare and freight on the railroads of a state. It seems to me, therefore, that the law of Minnesota did not prescribe anything that was not in accordance with due process of law in creating such a board, and investing it with the powers in question.

It is complained that the decisions of the board are final and without appeal. So are the decisions of the courts in matters within their jurisdiction. There must be a final tribunal somewhere for deciding every question in the world. Injustice may take place in all tribunals. All human institutions are imperfect — courts as well as commissions and legislatures. Whatever tribunal has jurisdiction, its decisions are final and conclusive unless an appeal is given therefrom. The important question always is, what is the lawful tribunal for the particular case? In my judgment, in the present case, the proper tribunal was the legislature, or the board of commissioners which it created for the purpose.

If not in terms, yet in effect, the present cases are treated as if the constitutional prohibition was, that no state shall take private property for public use without just compensation, — and as if it was our duty to judge of the compensation. But there is no such clause in the constitution of the United States. The Fifth Amendment is prohibitory upon the federal government only, and not upon the state governments. In this matter, — just compensation for property taken for public use, — the states make their own regulations, by constitution, or otherwise. They are only required by the federal Constitution to provide "due process of law." It was alleged in *Davidson* v. *New Orleans,* 96 U. S. 97, that the property assessed was not benefited by the improvement; but we he'd that that was a matter with which we would not interfere; the question was, whether there was due process of law. p. 106. If a state court renders an unjust judgment, we cannot remedy it.

I do not mean to say that the legislature, or its constituted board of commissioners, or other legislative agency, may not so act as to deprive parties of their property without due process of law. The Constitution contemplates the possibility of such an invasion of rights. But, acting within their jurisdiction, (as in these cases they have done,) the invasion should be clear and unmistakable to bring the case within that category. Nothing of the kind exists in the cases before us. The legislature, in establishing the commission, did not exceed its power; and the commission, in acting upon the cases, did not

exceed its jurisdiction, and was not chargeable with fraudulent behavior. There was merely a difference of judgment as to amount, between the commission and the companies, without any indication of intent on the part of the former to do injustice. The board may have erred; but if they did, as the matter was within their rightful jurisdiction, their decision was final and conclusive unless their proceedings could be impeached for fraud. Deprivation of property by mere arbitrary power on the part of the legislature, or fraud on the part of the commission, are the only grounds on which judicial relief may be sought against their action. There was, in truth, no deprivation of property in these cases at all. There was merely a regulation as to the enjoyment of property, made by a strictly competent authority, in a matter entirely within its jurisdiction.

It may be that our legislatures are invested with too much power, open, as they are, to influences so dangerous to the interests of individuals, corporations and society. But such is the Constitution of our republican form of government; and we are bound to abide by it until it can be corrected in a legitimate way. If our legislatures become too arbitrary in the exercise of their powers, the people always have a remedy in their hands; they may at any time restrain them by constitutional limitations. But so long as they remain invested with the powers that ordinarily belong to the legislative branch of government, they are entitled to exercise those powers, amongst which, in my judgment, is that of the regulation of railroads and other public means of intercommunication; and the burdens and charges which those who own them are authorized to impose upon the public.

I am authorized to say that Mr. Justice Gray and Mr. Justice Lamar agree with me in this dissenting opinion.