## CLEVELAND GASLIGHT & COKE CO. v. CITY OF CLEVELAND.

(Circuit Court, N. D. Ohio, E. D. November 14, 1891.)

No. 4,928.

1. CORPORATIONS—CHARTERS—RIGHT TO CHARGE REASONABLE RATES.

When a corporation is chartered with the right to manufacture and sell gas, the right to charge a reasonable rate for all gas furnished is implied, and forms a part of its contract with the state, which cannot be impaired by legislation.

2. CONSTITUTIONAL LAW—OBLIGATION OF CONTRACTS—CORPORATIONS—POLICE POWER.

The legislature of Ohio, in 1846, chartered the C. Gas Co., to make and sell gas in the city of C., no power being then reserved, by the constitution of the state or otherwise, to amend the charters of corporations. The company obtained the consent of the city to the laying of its pipes in the streets, and commenced business. In 1851, a new constitution was adopted by the state, providing that the legislature should have power to regulate and alter charters. Subsequently, the legislature passed an act authorizing cities to fix the price of gas, under which the city of C., by ordinance, fixed the price at which the C. Gas Co. should sell gas at a sum much below its cost. *Held*, that such legislation of the state, and of the city under its authority, impaired the *obligation of the contract* contained in the charter of the gas company, was not justified by the police power, and was void, and that the enforcement of the ordinance should be enjoined.

This was a suit by the Cleveland Gaslight & Coke Company against the city of Cleveland, Ohio, to enjoin the enforcement of an ordinance fixing the price of gas. The defendant demurred to the bill.

Boynton & Hale, J. M. Jones, Henderson, Kline & Talles, and Squire, Sanders & Dempsey, for complainant.

Edward S. Meyers, for defendant.

Before JACKSON, Circuit Judge, and RICKS, District Judge.

JACKSON, Circuit Judge. The constitution, and laws · of the United States made in pursuance thereof, are the supreme law of the land. We are all citizens of a dual government, state and federal. The people of the states made the general government, and conferred upon it its powers, and they have expressly said in the constitution of the general government that the constitution of the general government, and the laws and treaties made in pursuance thereof, shall be the supreme law of the land. We must give effect to that, beyond any question, however it may affect what may be called the dignity and sovereignty of the states. This, as already stated by the court, is one of the most important questions that the court has had before it for years. It is the great question of the future, as to how far legislative authority, the legislatures of states, and municipalities acting under legislative authority, may, under the guise of regulation, attack the property of individuals or corporations. Now, what is the case we have before us? In February, 1846, the legislature of Ohio, under constitutional authority, chartered the Cleveland Gaslight & Coke Company, with power and authority—the privilege, as we call it—to manufacture and sell gas

within the city limits of Cleveland. It did provide—as all this class of legislation usually provides—that, before entering upon the streets of the city that were under the control of the municipality for the purpose of laying down its pipes, its mains, and so on, it must get permission of the city. The city in due time gave its permission, and, having given its permission, and the company having laid down its pipes, the city, under well-established authorities, could not withdraw its consent. It becomes a fixed and vested right, under the terms and provisions of the charter, to manufacture and vend gas within the city limits of the city of Cleveland. That is clear, beyond a question. The constitution and laws of Ohio at that time reserved no power, either to repeal that charter or modify or alter or to change it in any respect. By the terms of the charter, there is necessarily imported in the right of the company, or necessarily implied, the right to charge a reasonable rate for all gas furnished, just as though that right had been expressed in the most positive terms in the charter itself. We read in that charter, therefore, the right inferred to make a reasonable charge for what it supplied to the city and the inhabitants of the city of Cleveland. There is no power in the aggregated sovereignty of Ohio to deal thereafter with that charter. The state had no power to deal with it, to abridge, curtail, or limit its powers, or to deprve it of its franchises after it had accepted its charter and laid down its pipes. Neither the city nor the state itself, in its sovereignty, had any power thereafter to modify, change, or alter that charter right of the gas company. The constitution of 1851 was as invalid to affect that charter as any legislative act passed without reference to that constitution. The constitution of 1851, in providing that there should be the power to regulate, modify, alter, or change charters, necessarily referred to charters thereafter passed or thereafter granted. It is well settled, under the decisions, that, so far as the contract feature of a company's charter granted in 1846 is concerned, it would be as much beyond the power of a convention making a new constitution to affect it as it would be beyond the power of the legislature to affect it. The whole sovereign people of Ohio, gathered together in convention, could not make a new constitution that would affect the rights of a corporation thus created in 1846. We come on down to an act of the legislature subsequent to the adoption of the constitution of 1851, an act which was passed after all the vested rights of this corporation had accrued, the date of which will be ascertained by a reference to the act, and which was an act authorizing municipalities in which gas companies are located or doing business to fix the price at which the gas shall be sold. We find the supreme court of Ohio construing that act, saying in substance and in effect that the price thus fixed by the municipal corporation is conclusive, unless it is attacked for fraud; that it may be attacked for fraud. We find then the municipal council of Cleveland fixing the rate of charge which this complainant shall make for its gas to consumers at 60 cents per thousand feet. The bill alleges distinctly, as a matter of fact, and not as inference of law, that it cannot manufacture and deliver gas at less than $1 per thousand feet

without loss, and that the city in fixing the price at 60 cents per thousand feet has fixed it at a price greatly less than that at which it can manufacture and deliver the gas. It claims that this is a taking of their private property without due process of law; and it alleges that this action was had without notice. These are all facts that we have to take as conceded by the demurrer.

The question that now faces the court is whether a municipal corporation, itself a consumer of gas, as alleged in the bill, in its corporate relation to the company, to the extent of $5,000 or $6,000 per month, can, under the legislative sanction conferred by section 2478 of the Revised Statutes of Ohio, fix, or has the constitutional right to fix, the terms or price at which itself and all other consumers shall pay for the gas furnished. It would be a fearful proposition—monstrously absurd and outrageous—if the legislature were to undertake to confer upon a citizen of Cleveland the right to say at what price services should be rendered to him, or what he should pay for goods and articles furnished him. There is hardly any law in this land that would make the party being furnished the judge of the price that he should pay, or would say that his arbitrary decision should fix the rights of the parties. The city of Cleveland has undertaken to do that thing under this section No. 2478, as disclosed by the bill. I am only dealing with the facts disclosed in the bill. She has undertaken to say that for the gas furnished to herself and to every consumer in this community the complainant shall only have and receive 60 cents per 1,000 feet, 40 per cent. less than complainant can manufacture gas and deliver it for. The complainant comes into this court, and in its bill, in substance and effect, says three things: You are by that action impairing the obligation of a contract that was made in 1846 between ourselves and the sovereign state of Ohio; and that you cannot do that under the constitution of the United States, which is the paramount law of this land, and which prohibits any state from impairing the obligation of a contract, either doing so directly or through the instrumentality of a municipal corporation by delegated authority. The thing cannot be done and ought not to be done. If we reflect about it for a moment, we will see that those two features of the constitution of the United States—the prohibition against the impairment of the obligation of contracts, and the interstate commerce clause of the constitution; the protection of persons and property against arbitrary action upon the part of the states—are the very fundamental principles upon which the preservation of this government must rest. If those constitutional provisions are not recognized by right-thinking men, if they are not rigidly enforced by the federal courts, the government of these states would not stand together for 10 years. There would be no machinery or power in the land to hold them together. If they may make war through their legislatures and their delegated authorities upon vested rights and contract obligations, if they may interfere with the commerce of other states, if they may be at liberty to deprive individuals or corporations of their vested rights, and dispose of their property rights, this government could not stand,—I mean, as

a government of free institutions,—any more than a government might be called free that would undertake to take the services of the individual, that would undertake to fix the price at which he shall sell his goods or at which he should render service to his fellow men. The government does, it is true, in a certain class of cases, exercise a guardianship over certain parties. It takes the poor sailor under its protection because he is an improvident creature, so to speak, and will watch over his contracts, shield him against the schemes of the wise, and prohibit the shipowner from dealing with him in an unjust way. In the distribution of its bounty to its soldiers, who suffered and encountered wounds and disabilities during the war, it will award its bounty, upon terms that will prevent any attorney or agent from unduly encroaching upon their enjoyment of that bounty; and that has been held to be constitutional as protecting the object of the government's bounty. But when you pass those two subjects, neither the government of the United States nor any state has the right or power to say what you shall charge for your services or for the products or goods that you may market, if you are not exercising a public privilege. If you are exercising a public privilege, then there is one limitation upon the power of regulation, and that limitation is that in the reduction of price or in the reduction of the compensation for services you must not go beyond the limits of reasonable compensation.

Now, what is the adjudication of the United States on this subject? I will notice it but a moment. The question came up in Munn v. Illinois, 94 U. S. 113, in reference to the elevator company. The question there presented was this: Is a company or individual who dedicates or appropriates his property to public use subject to legislative authority and control on the subject of the compensation he shall charge for the use of his property? That was the sole question. The supreme court of the United States, speaking through its then distinguished chief justice, said yes. That case involved merely the power. Nothing more. There was not a word about the question as to the limitation upon that power. There was not anything in the case that called upon the court to define the limitation of the power, or decide to what extent it might or might not go. But they did say in that case that when an individual or company dedicates its property to a public use, applies it to public use, invites public use, the police power of the state extended over the company to the extent of fixing rates. That was the only question presented, and the only question that the court was then called upon to consider. Subsequently, there came before the supreme court of the United States from Mississippi the question as to the power of the railroad commissioners of that state to fix the rates of the railroad companies running through the state for the carriage of passengers and freight. In that case some of the companies, in their charters, were allowed to charge reasonable rates; some of them were allowed to charge not exceeding 4 or 5 cents per mile; some of them had provisions that their directors might fix rates; and so on. The court said, in that case, simply that

the power did exist, notwithstanding those provisions of the charters. Notwithstanding those provisions in the separate charters of the different companies, the court held that the state of Mississippi did have the right to delegate to railroad commissioners the authority to regulate rates. But it distinctly stated, through its chief justice, in that case: "How far this regulation may go we do not now say. How far they may go in the direction of destruction we do not say. It is a dangerous line to define. It may be as indefinable as the lines between the colors in the rainbow." So they properly said, "We will wait until the precise question comes before us; but we throw out the intimation now that we do not mean to pass upon that question of the limitation of the power." Then came the Minnesota case, against the Chicago, Milwaukee & St. Paul Railroad Company. 134 U. S. 418, 10 Sup. Ct. 462, 702. In that case the supreme court was brought face to face with the question, may the power of regulation, which we concede in the states, go to the point of taking the services of these public carriers and fixing a rate which will be less than what is reasonable, just, and right, and less than will yield them a fair compensation for their services. They met the question, and they met it by saying that the question of a reasonable rate was a judicial question; that the question of a reasonable compensation was a judicial one; that it was not in the power of the state, directly, through its legislature, or through the delegated authority of a commission, to fix arbitrarily the compensation, or estop and shut the mouth, of the party who was to render the services and earn the compensation. They said, further, that whenever you take a man's services or property for less than it is worth, you are taking it without due process of law; that under such arbitrary action, and under such arbitrary legislation, you are taking it against the provisions of the federal constitution as embodied in the fourteenth amendment,—are depriving him of his property without due process of law. The courts have been driven time and again, by the necessities of the situation, to advance their steps in the direction of protecting property. The old theory upon the subject of eminent domain was that it related alone to the taking of property for public use. The supreme court advanced a step, in one of its recent decisions, beyond that, by saying, that, by saying, you take it, in effect, when you impair its value; that when you come so close to my property as to impair its value by the exercise of eminent domain, you are taking property just as effectually as if you put your rails upon it. I say, therefore, the condition of the country, and the tendency of legislation, brought them face to face, in the Minnesota case, with the question of how far the states, under the power of regulation, had the power to deal with the rates, that would fix them at figures that were not reasonable and not just to the companies rendering the services or furnishing the articles. And they have distinctly said, and there is no misunderstanding their meaning, that when they go, without a hearing, to a point beyond what is reasonable and right, the action of the state, directly or through its municipalities, is the taking of property without due process of law, and infringes upon

that constitutional provision that is invoked in this case. That 'it is a federal question admits of no doubt in the world. This court has had repeated occasion to consider the question as to whether the parties are compelled to go through the state courts. That is not the case. A party may take his writ of error from the highest court of the state, when the decision is against the constitutional rights set up, or is against the federal statute under which he claims, or right which he claims under a treaty of the United States. If, in the prosecution of a litigation in the state courts, that question arises, and the party does not get his rights conceded or allowed to him by the highest court of the state, he sues out his writ of error to the supreme court of the United States. But if there is a federal question, such as is presented in this case, and he comes directly to a federal court and asserts that federal question, an appeal lies directly from the decision of this court to the supreme court of the United States on that question. The court has no doubt, therefore, that a federal question, and one of the most serious character, is presented in this bill. It entertains no doubt about its jurisdiction to award the relief asked, and it entertains no doubt whatever that, under the facts stated in this bill, the relief that is asked should be granted, and that the council of the city of Cleveland should be enjoined from the enforcemnt of that ordinance on the case made in the bill. That will be the judgment of this court. The court is therefore compelled to overrule this demurrer, and put the defendant to an answer, if it desire to answer. If the defendant does not desire to answer, it may decline, and take an appeal directly from this judgment of the court to the supreme court of the United States, and have the whole subject fully reviewed. I should suggest to counsel, if they will take this suggestion of the court, that you do carry the case directly from this decision to the supreme court of the United States, and let this important question be settled by the highest court in this land,—and, perhaps, in any other.

The demurrer will be overruled, and if the defense enter of record that they decline to make further answer, of course then the decree will go that the bill be sustained, and that the city council of Cleveland be perpetually enjoined from the enforcement of the ordinance complained of in the bill.