Johnson, J.
From the papers referred to in the stipulation it is shown that The Marietta, Columbus & Cleveland Railroad Company was incorporated as a railroad company under the laws of Ohio, and for many years operated its line of railroad as a common carrier through the counties of Washington, Athens and Morgan. Its right of way was acquired under and by virtue of the laws of Ohio governing the acquisition of rights of way by railroad companies. Whatever rights the public has in connection with the railroad and property of a corporation created by the state and organized under its laws as a common carrier it had in this railroad.
In July, 1914, the common pleas court of Washington county on the application of the Columbia- *30 Knickerbocker Trust Company of New York, as trustee, holding a mortgage on the property of the company, appointed a receiver who continued the operation of the railroad in that capacity. In June, 1916, the court ordered the advertisement and sale by the receiver, as special master commissioner, of the property encumbered by the mortgage, “as a single and entire railroad property.” The property was so advertised, and in September, 1916, the receiver reported that he had sold'the property, “as a single and entire railroad property,” to one H. H. Isham, and the court thereafter confirmed the sale “as a single and entire railroad property.”
Prior to the execution of the deed the purchaser assigned to Charles W. Walters about 30 miles of the road between Curtis Junction and Marietta, and to J. H. Earnshaw, the remainder of the road, from Sharpsburg through Curtis Junction to Palos, about 16.5 miles. Deeds for the portions designated were executed and delivered to those persons.
The defendant in this case acquired from Earnshaw the portion deeded to him.
The complaint here is that The Black Diamond Company, contrary to law, assumes to exercise franchises and privileges not allowed to it, and now operates said railroad for its own purposes solely; that it wholly excludes the public from any right or benefit in the use of said railroad as a common carrier. The defendant claims that it rightfully purchased the portion of' the railroad referred to and that it uses the same as an industrial switch from its coal mines to the nearest connecting railroad. It admits that it has contracted with four *31 parties by special contracts to carry their freight, expressly providing that it does not do so as a common carrier.
The purpose clause of the articles of incorporation of the defendant company includes the provision, “of constructing and owning railroads with single or double tracks, switches, sidetracks, tramways, turnouts, offices, and depots, as may be necessary in order to connect its mines and properties with any other railroad or navigable watercourse.” It asserts that its right is based on Section 10141, General Code. Under that section mining companies are authorized to construct such a switch as above described from their mine to any other railroad, and it is provided in respect to such switch that “they shall be subject to and governed by the provisions of chapter two of this title.”
It is conceded that this section must be strictly construed, and that it does not confer power on the company to operate such road as a common carrier.
In Miami Coal Co. v. Wigton, 19 Ohio St., 560, it was held, that, under the strict construction applicable to the grants of the power of eminent domain to corporations, the act does not authorize a mining company to exercise the same power to appropriate private property that is conferred on railroad companies by acts in relation to railroads.
By the provisions of Section 8861, General Code, “A person owning or operating a coal or iron-ore mine * * * who, as a means of removing the product thereof, uses or desires to use a railway, may construct one and run cars thereon, over or *32 under any railroad or public highway, the consent of the owner of the fee in the land at such crossing first being obtained. Such railway shall be so constructed as in no wise to impede or interfere with the running of cars or the travel upon such railroad or highway, or in any manner injure or impair either, or any switch, building, or appurtenance connected therewith or belonging thereto. * * * ”
It is manifest that the legislature, in recognition of the fact that the operation of such a line across railroads and public highways at grade would be dangerous, felt the necessity of making specific provisions as to the construction of an industrial line. We think it must be conceded that the portion of the railroad which the defendant is now operating is not an industrial road or switch, such as is authorized to be constructed and operated under the statutory provisions referred to.
It is contended that the provisions of Section 8861, General Code, as to elimination of grade crossings, are permissive and not mandatory, except the portion thereof that requires that such freightway or switch shall be so constructed as not to impede or interfere with the running of cars or travel on such railroad or highway. As above shown the statute must be strictly construed. There would be no right whatever to construct or operate such a line in the absence of statute, and nothing can be done under it different from or in excess of what is expressly permitted. It is conceded that the crossings referred- to are at grade, but it is suggested that even if the statute is mandatory the public rights can be enforced by a *33 proper action. But the question here is, whether the defendant company, not being a common carrier, can operate for its own purposes, and for the purposes of those with whom it may privately contract, the portion of this railroad that it has acquired, which was constructed for and devoted to the public service by a corporation organized and operated as a common carrier. Much stress is laid upon the fact, that, at the time of the confirmation of the sale “as a single and entire railroad property,” the purchaser stated to the court that in case the sale was confirmed, as soon as he acquired title and was placed in possession of the property by the court, he would at once discontinue the operation of the railroad. As to this it must be noted that there was no application made to the court to dismantle the railroad or abandon its use as a public carrier; no notice was given during any stage of the proceedings that any such application would be made; and, as already indicated, the order of sale, the advertisement of the sale, and the confirmation of the sale, were of one single and entire railroad property.
In the entry of confirmation, following the recital of the statement above referred to by the purchaser, is the further recital that the court, finding “that the sudden cessation of the operation of said railroad property at the present time would be a serious inconvenience to the general public now being served by said railroad property,” suspended the completion of said purchase until November 1, 1916, and ordered the receiver to continue the operation of the railroad until that date and there *34 upon to discontinue the same. It will be noted that at the time named the title passed to the purchaser; and it is significant that the court found that serious inconvenience would result to the general public then being served by said railroad property by its sudden discontinuance. It is not shown or suggested that it was not an equally serious inconvenience to the general public to discontinue the service after the date named.
The portion of the road now held and operated by the defendant begins at the village of Sharps-burg, extending southwardly to Curtis Junction, a distance of 2.8 miles, and thence to Palos, a distance of 13.7 miles, traversing portions of Athens and Morgan counties.
Where the public has a real and substantial right in the use of property which has been devoted to the public use under the sanction of the state, that right should be properly safeguarded in every legal proceeding concerning the property. D., X. & B. Rd. Co. v. Lewton, 20 Ohio St., 401, 412.
There is not involved in this case any question as to the right to dismantle, abandon or scrap a line of railroad on account of failure to return a. proper compensation for its operation. We know of no way to compel the owner of a line of railroad, which in its proper operation does _not produce sufficient revenue to afford proper compensation, to continue its operation. We think it obvious that there could be no such compulsion. Such a situation has been considered in many cases.
In a leading case, Jack v. Williams et al., 113 Fed. Rep., 823, the company which built the road *35 had become insolvent and it appeared that any attempt to operate it would result in loss. Under these circumstances the court authorized the road to be dismantled and the rails sold. At page 827 it is said: “Whilst thus serving the public, however, no corporation or private person is obliged to continue the service without a reasonable remuneration. No one can be compelled to serve the public for nothing. Private property of no kind, including railroad property, can be used for public purposes without compensation. Smyth v. Ames, 169 U. S. 467, 18 Sup. Ct. 418, 42 L. Ed. 819; Road Co. v. Sandford, 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560; Chicago, M. & St. P. R. Co. v. Minnesota 134 U. S. 418, 10 Sup. Ct. 462, 33 L. Ed. 970; Railway Co. v. Smith, 173 U. S. 684, 19 Sup. Ct. 565, 43 L. Ed. 858.”
Upon proper notice and showing the court in the foreclosure proceeding, or in any other proper proceeding, might authorize the discontinuance and dismantling of the road.
There is in this case no intention or attempt to dismantle the property or abandon it; but the defendant is operating a line of railroad which was constructed by a corporation organized as a common carrier by the state, with authority to exercise the sovereign power of the state in the interest of the general welfare. The only constitutional warrant for the taking of private property and public highways is that their use is needed for the common good.
In Gates v. Boston & N. Y. Air Line Rd. Co, 53 Conn., 333, 342, it was held that when railroad *36 property essential to the public use is once devoted to that use, the public has a right that it shall remain pledged to that use, and this is superior to the property rights of the corporation, its stockholders and bondholders. In the opinion it is said: “Upon principle it would seem plain that railroad property once devoted and essential to the public use, must remain pledged to that use so as to carry to full completion the purpose of its creation; and that this public right, existing by reason of the public exigency, demanded by the occasion, and created by the exercise by a private person of the powers of a state, is superior to the property rights of corporations, stockholders and bondholders.” Authorities holding a similar view as to the nature of such property are as follows: Metz v. Buffalo, C. & P. Rd. Co., 58 N. Y., 61; Northern Pac. Ry. Co. v. Townsend, 190 U. S., 261, 267; Connor v. Tenn. Central Ry. Co., 109 Fed. Rep., 931, 940; Lawrence v. Morgan’s L. & T. Rd. Co., 39 La. Ann., 427; D., X. & B. Rd. Co. v. Lewton, 20 Ohio St., 401, 412; Coe v. Columbus, P. & I. Rd. Co., 10 Ohio St., 372, 378.
In State v. Hazelton & Leetonia Ry. Co., 40 Ohio St., 504, a proceeding in quo warranto was brought to oust the company for the misuse of powers, franchises and privileges conferred on it. The court held that a railroad company assumes the performance of duties for the benefit of the public generally, and that when such a corporation, for a period of five years, fails to construct a line'of railroad named in its charter, but condemns private' property and constructs a railroad wholly unsuited *37 to the wants of the public, and for the benefit only of coal mines, owned and operated by the principal corporators and stockholders of such railroad company, it is a misuse of its corporate powers, franchises and privileges. In the opinion it is said:. “Judging from the things done by the corporation, its. sole object was to furnish a means of transferring the products of the private mines, owned and operated by the principal incorporators and stockholders, to a place where they could be carried to market.”
It is said by Minshall, J., in State, ex rel., v. P., Y. & A. Rd. Co., 50 Ohio St., 249: “It may well be conceded, that the condemnation of private property for a private use, and its use for such purpose only, constitutes a flagrant abuse of the power of eminent domain, and that a company guilty of such abuse of its power should be deprived of its corporate franchises and be dissolved.”
It is very clear from these authorities that The Marietta, Columbus & Cleveland Railroad Company could not have operated its line of railroad, nor any portion thereof, as the defendant now claims the right to operate it. Has the purchaser of the part of the line which he acquired pursuant to a judicial sale any greater right in its operation than the original corporation owner ? The statutes of Ohio regulating the transfer of railroad property by a private sale and by judicial sale are very comprehensive.
Sections 9054 to 9063 provide for the transfer, by a company unable to complete its road, to any *38 other railroad company incorporated under the laws of Ohio.
Sections 9064 to 9075, inclusive, contain provisions for transfer by receivers and by judicial sales, and under these sections the only purchaser authorized is a company organized under the laws of the state, or any number of persons not less than five, who, having purchased such road and franchises at such a sale, may become a corporation by filing a transcript with a decree of confirmation in the office of the secretary of state. This was the state of the law until the act found in 77 Ohio Laws, page 60, was passed. By this act, which is Sections 3426a and 3426b, Revised Statutes, and which is included in Sections 9076, 9077 and 9078, General Code, it is provided that the purchaser or purchasers of the property, roadbeds, rights of way, fixtures and franchises of a railroad company in this state, situated wholly or in part in this state, sold pursuant to judicial order, judgment, or decree, which sale has been confirmed by the court making the order of sale, may sell the same, or any part thereof; and that the title thereto, with all the rights, liberties, facilities and franchisés, shall pass by such sale and vest in the purchaser or purchasers.
By the second section of the law, which became 3426b, Revised Statutes, and is now Sections 9077 and 9078, General Code, it was provided that any railroad company may become the purchaser of such property, as provided in the first section of the act, and any number of persons may become the purchasers of such road, either directly at such *39 judicial sale or by grant from the purchasers at such sale, and on filing a copy of the deed in the office of the secretary of state, with articles of incorporation, such persons, not less than five in number, shall become a corporation, and in the operation and maintenance of its railroad such corporation shall be entitled to all the rights and subject to all the obligations and restrictions imposed upon railroad companies by the laws of the state.
It seems clear from these provisions that the sale and transfer contemplated is of the railroad property as such. The rig-hts, liberties, facilities and franchises shall pass by such sale as fully as if the same had been possessed, exercised and enjoyed by such railroad company. It is provided that the franchises shall pass to the purchaser.
The term “franchise” has a dual meaning. Its scope and meaning must be determined by its application. There is a wide difference between a franchise which inheres in the right to exist as a corporation and a franchise to exercise certain special privileges as such; for instance, the right to occupy or cross public highways and to construct in or across them and operate thereon a public utility.
The defendant is using for its own purposes a line of railroad which has become clothed and impressed with a public use. The company not being organized as a common carrier could not itself have acquired the rights and constructed the line as the rights and the line here involved were acquired and constructed. The railroad company itself could not have transferred the property to defendant *40 company with the right to operate it privately, and we find no warrant in law to hold that the defendant company acquired that right through the foreclosure proceeding.
It cannot accomplish by indirection what it is not permitted to do directly.
In Dayton, X. & B. Rd. Co. v. Lewton, supra, in which the subject is considered, Judge Mcllvaine says, at page 412: “The rights of the public must not be ignored; and it is the right of the public that this highway be maintained. It was by and through the exercise of its power of eminent domain that it was established.”
Otherwise purely private enterprises could cause the organization of a railroad company, which would acquire rights of way with the privilege of operating dangerous agencies on and across public highways, interurban lines and other railroads — all of which it could only do in the advance of the public .interest — and then could go forward with steps by which the private concern would acquire for its private purposes the public privileges and property so created.
In this particular case the defendant was doubtless actuated by the feeling that it was compelled to proceed as it has in order to find access to its markets, but by the formation of a common-carrier corporation it will accomplish this commendable object and will use a public property for a public purpose.

Writ allowed.

Nichols, C. J., Wanamaker, Newman and Matthias, JJ., concur.